2003 VT 26

# State of Vermont v. Shawn K. Gibney

[825 A.2d 32]

No. 99-081

Present: Amestoy, C.J., Dooley, Morse,* Johnson and Skoglund, JJ.

Opinion Filed March 28, 2003

---

* Justice Morse sat for oral argument but did not participate in this decision.

*Diane C. Wheeler*, Franklin County Deputy State's Attorney, St. Albans, for Plaintiff-Appellee.

*Robert Appel*, Defender General, *Anna Saxman*, Deputy Defender General, and *Henry Hinton*, Appellate Attorney, Montpelier, for Defendant-Appellant.

¶ 1. **Dooley, J.** Defendant appeals from his conviction by jury on one count of first-degree murder, for which he received a sentence of fifty years to life. Defendant makes four claims on appeal: (1) the jury's guilty verdict was not supported by the evidence; (2) he was improperly prohibited from offering exculpatory evidence that other persons had the motive to kill the victim; (3) the court erred in failing to dismiss the case, or to impose an alternate sanction, because of the prosecution's destruction of possibly exculpatory notes taken by various police officers during their investigation; and (4) the court erred in concluding that defendant's sentence should be aggravated because the crime had multiple victims. We affirm the conviction, but reverse the sentencing decision and remand for resentencing.

¶ 2. Defendant's first claim on appeal is that the guilty verdict is not supported by the evidence and thus the trial court erred in denying his motion for a judgment of acquittal. Because defendant was charged with first-degree murder, the State was required to prove beyond a reasonable doubt that defendant killed the victim, Sam Gendron, that he intended to do so, and that he did so deliberately and with premeditation. *State v. Couture*, 169 Vt. 222, 226, 734 A.2d 524, 527 (1999); 13 V.S.A. § 2301. The

evidence, taken in the light most favorable to the State and excluding any modifying evidence, must sufficiently and fairly support a finding of guilt beyond a reasonable doubt. See *State v. Durenleau*, 163 Vt. 8, 10, 652 A.2d 981, 982 (1994). The evidence "must be examined both for its quality and strength," and it cannot create a mere suspicion of guilt or leave guilt uncertain or dependant on conjecture. *Id.*

¶ 3.  This was an assassination. The victim was shot multiple times by a semi-automatic assault rifle while driving in his pick-up truck. One of the bullets blew away a portion of Gendron's scalp and skull; a portion of the skull was found on the ground near the truck. Thus, there is no dispute that whoever shot Gendron did so with intent to kill, deliberately and with premeditation. The only issue in the trial was whether the State proved beyond a reasonable doubt that defendant was the shooter.

¶ 4.  The State's case was strongest with respect to motive. In May 1992, defendant assaulted Gendron, his supervisor, when they both worked for Blue Seal Feeds in Richford. Defendant was convicted of simple assault for this incident and, on June 2, 1992, he was fired from his job because of it. Defendant blamed Gendron for his discharge and threatened and harassed him thereafter. On one occasion defendant called Gendron a "dead man." Defendant told an investigating police officer that next time he would take care of Gendron and "blow his head off." The murder occurred on June 2, 1997, exactly five years after defendant was fired from his job.

¶ 5.  No one saw the murder, but up to a point, the State made a strong showing that defendant had the opportunity to commit the crime. Every day around 11 A.M., Gendron left work and drove home for lunch, proceeding in his pick-up truck up Hardwood Hill Road. On the day of the murder, he punched out of work at 11:36 A.M. and proceeded home, some ten minutes away by vehicle. He was shot from the side of the road as he proceeded up the hill. Neighbors called for an ambulance at 11:51 A.M.

¶ 6.  Numerous observers saw defendant standing along Hardwood Hill Road next to his blue Cadillac automobile, placing the times of observation at some point between 10:30 A.M. and 11:30 A.M. He smoked a number of cigarettes at this location and drank from a plastic Coca-Cola bottle. His location was approximately that from which the shots at Gendron were fired. No one saw defendant or his vehicle leave that location. Although defendant did not testify at trial, his evidence suggested that he was at that location looking for a place to grow marijuana plants.

¶ 7.  At this point, the opportunity evidence becomes less clear. A witness was walking up Hardwood Hill Road when Gendron passed in his truck going in the same direction. About thirty seconds thereafter, the

witness heard shots and the sound of a running motor on the truck, but observed no one else driving on Hardwood Hill Road. The observer came up to the truck off the road, saw Gendron's body, and proceeded to the next house up the hill. At that house, three persons were working. They heard the shots, and one went outside to look. He could see the road but neither saw nor heard a vehicle pass on it after the shots.

¶ 8. The only access to the point of the shooting by car was by Hardwood Hill Road. However, bike trails provided access to Hardwood Hill Road near the point of the shooting for off-road vehicles.

¶ 9. The main evidence that defendant was gone from Hardwood Hill Road at the time of the shooting came from Carolyn Rivers, who testified that she was driving on South Richford Road to reach the Richford town clerk's office by noon. She testified that she saw defendant proceeding towards her and passing her; he was driving fast and in the middle of the road. She estimated that the point of passage was a thirty-minute drive from the point of the shooting on Hardwood Hill Road. She said she saw defendant at about 11:45 A.M.

¶ 10. Although the State identified the assault rifle as an AK-47 or similar type, it never found the murder weapon. It did establish that defendant once owned an assault rifle of the type used in the murder. During a search of defendant's house, it found an empty box of cartridges for such a rifle.

¶ 11. Defendant was arrested some twelve hours after the crime.

¶ 12. Defendant's position is that the State did not prove that he was at the shooting point at the time Gendron was shot, and thus the State's evidence is insufficient to establish guilt beyond a reasonable doubt. He points to the testimony of three witnesses — two who testified to seeing no car proceed on Hardwood Hill Road immediately after the shooting, and one who testified to observing defendant thirty minutes away within minutes of the shooting — that he argues precludes any inferences of guilt that can be drawn from the State's circumstantial evidence.

¶ 13. The undisputed State's evidence that defendant committed the crime was very strong. Defendant's motive, his threat to "blow [Gendron's] head off," the date of the shooting, the method of the killing, defendant's observed presence at the place from which the shots were fired shortly before the shooting, and his weak explanation for his presence would add up to an overwhelming case against him. The fact that the evidence is circumstantial is not determinative. See *State v. Findlay*, 171 Vt. 594, 599, 765 A.2d 483, 487 (2000) (mem.) ("While it is true that evidence leaving a determination of guilt wholly dependent upon conjecture is insufficient, circumstantial evidence may serve as proof of

guilt beyond a reasonable doubt."). Indeed, recognizing that a claim of coincidence would be incredible, counsel on appeal argued that defendant must have been set up by an unknown killer who was aware of defendant's movements and wanted to frame him for the crime while killing Gendron.

¶ 14. The issue then is how we must consider the countervailing evidence. Our standard for reviewing a denial of a motion for a judgment of acquittal requires us to determine only whether the State's evidence, *taken in the light most favorable to the State and excluding any modifying evidence*, sufficiently and fairly supports a finding of guilt beyond a reasonable doubt. *Durenleau*, 163 Vt. at 10, 652 A.2d at 982. By modifying evidence, we mean exculpatory evidence introduced by defendant, such as countervailing testimony. See *United States v. Kelley*, 152 F.3d 881, 886 (8th Cir. 1998) (in ruling on a motion for a judgment of acquittal, which tests the sufficiency of the evidence, the court must determine whether there is substantial evidence justifying an inference of guilt, "irrespective of any countervailing testimony that may be introduced"); *United States v. Wolfson*, 322 F. Supp. 798, 806 (D. Del. 1971) (in ruling on a motion for a judgment of acquittal, the court must determine whether there is substantial evidence justifying an inference of guilt, "irrespective of the evidence adduced by the defendant"). Moreover, credibility determinations are for the jury, not the court. See *Burks v. United States*, 437 U.S. 1, 16-17 (1978).

¶ 15. The testimony of Carolyn Rivers introduced by defendant was in the nature of an alibi. See *State v. Ovitt*, 126 Vt. 320, 327, 229 A.2d 237, 242 (1967) ("By an alibi the accused attempts to prove that he was at a place so distant from the scene of the offense that his participation in the crime was impossible."). We have routinely treated alibi testimony as modifying evidence that does not prevent a case from going to the jury. See *State v. Dezaine*, 141 Vt. 335, 338, 449 A.2d 913, 914 (1982); *State v. Parker*, 139 Vt. 179, 182, 423 A.2d 851, 852 (1980); *State v. Ladabouche*, 127 Vt. 171, 173, 243 A.2d 769, 771 (1968); *State v. Howard*, 108 Vt. 137, 145, 183 A. 497, 500-01 (1936). Although the jury could reconcile the Rivers testimony with that of witnesses who saw defendant on Hardwood Hill Road towards 11:30 A.M., it could also find a conflict in the testimony. Whether or not there was a conflict, the jury could find that Rivers was mistaken in her time estimates.

¶ 16. We conclude that we must similarly treat the testimony of Daniel Parsons, the witness who came out of the house above the scene of the shooting after hearing shots. In view of all of the evidence, the jury could conclude that he did not exit the house quickly enough to see a fleeing car

driven by defendant. Again, we must view this testimony as modifying evidence.

¶ 17. We acknowledge that determining the sufficiency of the evidence is a matter of judgment. We also acknowledge that if the case for conviction were substantially less strong, it could reach a point where it could not prevail over the countervailing evidence under the reasonable doubt standard. In this case, however, we conclude that the evidence as a whole sufficiently and fairly supports a jury verdict of guilt beyond a reasonable doubt. The court did not err in denying the motion for a judgment of acquittal.

¶ 18. Defendant's second claim on appeal is that he was improperly prohibited from offering exculpatory evidence that other persons had the motive to kill Sam Gendron. When it became clear that defendant intended to offer evidence of Gendron's sexual misconduct to show that others might have killed him because of this misconduct, the State, at the urging of the court, filed a motion to exclude this evidence. In response, defendant summarized the evidence of Gendron's misconduct and argued that it was admissible. Specifically, defendant wanted to show, through twenty or more witnesses, that Gendron was observed masturbating in his vehicle while watching children walking on the street and that he had a reputation for such conduct. The witnesses included a school official, a town constable, and a state police officer who had investigated the allegations. The defense also wanted to show that Gendron, while in high school many years earlier, had stalked a young woman and forced her into his truck with a knife.

¶ 19. In its motion in limine, the State argued that Gendron's alleged inappropriate sexual conduct was never substantiated and, thus, was only rumor and gossip. Therefore, the State argued, any probative value of these unsubstantiated rumors of sexual misconduct would be substantially outweighed by confusion of the issues and prejudice to the jury. See V.R.E. 403. It also argued that the evidence could not be admitted unless the defense identified an alternative perpetrator who had the motive and opportunity to commit the crime.

¶ 20. The court granted the motion in limine, based largely on the second argument. The court reasoned:

> This court is not faced with a situation in which there is an individual, or individuals, whose motive, opportunity, and evidence of a direct connection can be examined. No person or persons have been identified. The defense points to an apparently mixed brew of gossip, innuendo, and unsubstantiated

> allegations as providing motive, but nothing in the way of opportunity or direct connection evidence.
>
> . . . .
>
> This court will exclude all evidence of, or reference to, these allegations. The defense has not shown the motive, opportunity, nor any evidence to directly connect any third person to the crime charged . . . . Furthermore, this court is unable to find that these allegations are relevant as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable," V.R.E. 401, and that its admission would prove to "confuse the issues," "mislead the jury," and be a "waste of time," V.R.E. 403.

The court returned to the issue after the jury verdict in response to defendant's motion for a new trial and added that because defendant was able to depose and cross-examine the investigating officers, "[d]efendant was not denied a fair opportunity to present his theory of defense." The trial court also added that defendant failed to demonstrate "specific or cognizable leads that the State's investigators declined to explore."

¶ 21. Defendant argues that the grant of the motion in limine violated his right to present exculpatory evidence and a defense under Chapter I, Article 10 of the Vermont Constitution and the Sixth Amendment to the United States Constitution.

¶ 22. Defendant has a constitutional right to present evidence in his favor. See *State v. Corliss*, 168 Vt. 333, 337, 721 A.2d 438, 441 (1998). However, the evidence must be relevant and admissible under the rules of evidence. *Id.* at 337, 721 A.2d at 441-42; *State v. Gilman*, 158 Vt. 210, 214, 608 A.2d 660, 663 (1992). Even if evidence is admissible, it must pass the balancing test of Rule 403 — that is, its probative value cannot be substantially outweighed by its prejudicial effect. See V.R.E. 403; *Corliss*, 168 Vt. at 337, 721 A.2d at 442.

¶ 23. Rule 403 decisions are highly discretionary. *State v. Webster*, 165 Vt. 54, 56, 675 A.2d 1330, 1332 (1996). We will not reverse a decision to exclude evidence under Rule 403 absent abuse of that discretion. *Id.*

¶ 24. For three reasons, the evidence offered by defendant had limited probative value. First, it was offered to show an alternative perpetrator of the crime. We held in *State v. Gilman* that evidence of another person's involvement in a crime can be admitted if the proponent of the evidence shows motive, opportunity, and " 'some evidence to

directly connect [the] third person to the crime charged.' " 158 Vt. at 214, 608 A.2d at 663 (quoting *State v. Denny*, 357 N.W.2d 12, 17 (Wis. Ct. App. 1984)) (alteration in original); see also *State v. Griswold*, 172 Vt. 443, 446, 782 A.2d 1144, 1146 (2001). Because defendant cannot identify an alternative perpetrator, he cannot link the alternative perpetrator to the crime or show that this alleged perpetrator had both motive and opportunity to commit Gendron's murder. See *State v. Cole*, 695 A.2d 1180, 1183 (Me. 1997) (court could exclude alternative perpetrator evidence under Rule 403 where there was "no evidence to identify a specific alternate perpetrator" because probative value was slight and it could confuse the issues and mislead the jury); *State v. Holterman*, 687 P.2d 1097, 1101 (Or. Ct. App. 1984) (court properly excluded evidence that murder victim was associated with undercover officer under Rule 403, in absence of any identification of alternative perpetrator).

¶ 25. Second, with respect to the bulk of the proffered evidence, defendant has shown that Gendron may have engaged in misconduct but has not identified a victim of that misconduct. As far as the evidence goes, Gendron became sexually aroused by viewing young children but never acted to contact those children. In the absence of a victim of Gendron's misconduct, it is unlikely that anyone would have responded to the misconduct by killing Gendron.

¶ 26. We recognize that defendant's evidence showed one incident with a victim, but that incident occurred when Gendron was in high school some twenty years earlier, and there was no showing that it resulted in physical harm. The court could discount this incident as too remote to suggest that the victim of that misconduct shot Gendron.

¶ 27. Third, at least as to events that might have occurred near to the time of Gendron's death, the evidence was speculative; it consisted of the testimony of persons whose official status caused them to investigate Gendron's conduct. Although these persons received complaints about that conduct and investigated, they were unable to confirm that conduct.

¶ 28. Defendant answers this weakness in the probative value of the evidence with the argument that Gendron's reputation for this misconduct was sufficient even if that reputation was inaccurate. We emphasize again that the reputation alleged by defendant involved no specific victim of Gendron's alleged crimes.

¶ 29. Weighed against the limited probative value of defendant's proffered evidence was the prospect of confusion of the issues by a twenty-witness mini-trial of Gendron for sexual misconduct, with no real connection to the offense being tried. The defense position raised a real concern that the effect of the evidence would be to smear the victim and

divert attention away from the murder. We conclude that the court acted within its discretion in excluding the evidence.

¶ 30. Defendant next argues that the court erred in failing to dismiss the case, or to impose an alternate sanction, because of the prosecution's destruction of potentially exculpatory evidence — that is, the notes taken by the various police officers during their investigation. This issue first arose formally in February 1998, almost nine months after defendant was arrested, when defendant moved to dismiss the case because investigating officers had destroyed their investigatory notes. The motion alleged that by letters to the state's attorney, the chief investigation officer, and various police officers, defense counsel had requested that field notes be retained and be forwarded to him, but that the officers refused to honor that request and deliberately destroyed the notes. The motion further alleged that the notes contained valuable information often omitted from the final reports. Defendant sought four overlapping remedies: (1) dismissal of the case; (2) exclusion of the testimony of any witness who was interviewed by police, but the notes of the interview have been destroyed; (3) preclusion of prosecution rebuttal of any evidence "potentially effected by the destroyed evidence"; and (4) a jury instruction "concerning the finding of State misconduct."

¶ 30. Based on a three-day evidentiary hearing, the court denied the motion, except with respect to the jury instruction. After detailing the activities of each of the police officers, the court made the following findings:

15. The officers discarded their notes as had been their practice and procedure as there is no Vermont State Police policy or procedure that dictates that the officers either keep or destroy their notes.

16. The reports generated by the law enforcement officers contained information relevant to the case, both positive and negative. The reports did not exclude any information that tended to negate the guilt of the defendant as to the offense charged or that would tend to reduce the punishment therefore.

17. Some irrelevant or insignificant matters were not included in the officers' notes nor were they included in the reports.

18. Based on the testimony and exhibits admitted into evidence during the course of these hearings, defense counsel have received numerous police reports and witness statements, and have deposed several persons during the course of the discovery

process. As a result, defense counsel have been able to question witnesses as to all matters in preparing their defense.

The court concluded that there was no reasonable possibility that the destroyed notes contained exculpatory material. Specifically, the court reasoned:

> Each of the officers was questioned extensively by the defense in three days of hearings before this court. The defendant's attorneys have had access to all police reports, to all witnesses and to all officers. Three of the officers have, in fact, preserved and produced their notes. All of the officers have been subject to deposition.

> After an extensive review of the transcripts of the hearing and the defense motion, this court finds that the defense has not made any showing that there is a reasonable possibility that the destroyed notes would be in any way exculpatory. The defense extensively questioned the police regarding their methods of investigation and questioning, and, while the defense may have shed some light on police practices, they have not connected this testimony to a showing that the handwritten notes of the officers were in any way exculpatory to defendant.

The court also concluded that the destruction of the notes was not done in bad faith.

¶ 32.  Following the trial, defendant included the destroyed notes as a ground in his motion for a new trial. The court, in its judgment and sentence order, reiterated that there was no reasonable possibility that the notes contained exculpatory material and added:

> Second, assuming arguendo that the requisite showing had been made, the court was then obliged to perform a "pragmatic balancing" of three factors (i.e., government's culpability, importance of the lost evidence, and other evidence of guilt adduced at trial) to determine the proper sanctions. Since the other evidence of guilt adduced at trial was great, the government's culpability relatively low and value of the lost notes to the defense unknown, the appropriate sanction, if any, would have been an adverse inference instruction to the jury. The jury was so instructed.

(Internal citations omitted.)

¶ 33. On appeal, defendant argues anew that the court erred in failing to dismiss the case, or to impose a sanction beyond the jury instruction, but shifts the focus somewhat to evidence that came out in depositions or in the hearing on the motion to dismiss. We first address the motion made below and its disposition, and then address the additional considerations raised on appeal.

¶ 34. Both as a matter of due process of law, see *Brady v. Maryland*, 373 U.S. 83, 86-88 (1963), and under the discovery rules we have adopted, see V.R.Cr.P. 16(b)(2), the prosecution has an obligation to disclose to the defense any exculpatory material within its possession or control. This obligation includes evidence that can be used to impeach a prosecution witness. *United States v. Bagley*, 473 U.S. 667, 676 (1985). It includes offers of benefits in return for testimony. See *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

¶ 35. The destruction of possibly exculpatory evidence by the State can violate its burden of production. Where the exculpatory value of the evidence is unknown prior to its destruction, the issue is controlled under the Fourteenth Amendment by the Supreme Court decision in *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). See *State v. Benoit*, 158 Vt. 359, 362, 609 A.2d 230, 231 (1992). *Youngblood* holds that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58.

¶ 36. Here, the district court found that the officers did not act in bad faith; instead they followed their long-standing practice and procedure. See *State v. Delisle*, 162 Vt. 293, 309, 648 A.2d 632, 642 (1994) (for purposes of *Youngblood*, bad faith means improperly motivated); see also *California v. Trombetta*, 467 U.S. 479, 488 (1984) (no bad faith where officer destroys breath sample in accord with normal procedure and has no animus to defendant or intent to suppress evidence). That conclusion is supported by the findings which are, in turn, supported by the evidence. Thus, this case is controlled by *State v. Benoit*, another "destruction of notes" case, in which this Court held that in the absence of a finding of bad faith, there could be no violation of the United States Constitution. 158 Vt. at 362, 609 A.2d at 231.

¶ 37. We have, however, adopted a different standard under Chapter I, Article 10 of the Vermont Constitution, which guarantees that a defendant can "call for evidence in [his] favor." In *State v. Delisle*, we rejected *Youngblood* as setting the standard under Article 10:

We believe, however, that *Youngblood* is both too broad and too narrow. It is too broad because it would require the imposition of sanctions even though a defendant has demonstrated no prejudice from the lost evidence. It is too narrow because it limits due process violations to only those cases in which a defendant can demonstrate bad faith, even though the negligent loss of evidence may critically prejudice a defendant. Because the *Bailey* test balances the culpability of the government's actions and the prejudice to a defendant, we adopt it as the state constitutional standard.

162 Vt. at 310, 648 A.2d at 643. The *Bailey* test, readopted in *Delisle*, is the standard we used prior to *Youngblood*. See *State v. Bailey*, 144 Vt. 86, 94-96, 475 A.2d 1045, 1050-51 (1984).

¶ 38. *Bailey* first requires that the defendant show a "reasonable possibility" that the lost evidence would have been favorable. *Id.* at 94, 475 A.2d at 1050. If the defendant makes the requisite showing, the court must perform "a pragmatic balancing" of three factors:

> (1) the degree of negligence or bad faith on the part of the government; (2) the importance of the evidence lost; and (3) other evidence of guilt adduced at trial.

*Id.* at 95, 475 A.2d at 1050.

¶ 39. We have performed the *Bailey* analysis in a number of cases. In *Bailey* itself, a case involving a sexual assault in the defendant's bedroom, we found that the defendant made the preliminary showing of a "reasonable possibility" that analysis of the defendant's sheets and bedding, as promised by the State when it seized this evidence, could have shown an absence of sperm or other secretions. See *id.* We concluded that the State was negligent in failing to perform the analysis while it was possible to do so, although the State promised the defendant that it was doing the analysis and thus effectively prevented the defendant from doing so independently. *Id.* at 96, 475 A.2d at 1051. We also concluded, however, that the evidence was not important because the passage of the two days meant that the bedding could have been changed and because the evidence against the defendant was otherwise strong. *Id.* Accordingly, we found no violation of Article 10. *Id.* at 97, 475 A.2d at 1052; see also *State v. Smith*, 145 Vt. 121, 127-28, 485 A.2d 124, 128 (1984) (under balancing of factors in a rape case, no violation of the defendant's constitutional rights because the evidence was lost by a private physician, the lost evidence was not crucial to the defendant's case, the evidence did

not go to the crucial issue of whether the victim consented to intercourse, and the evidence could not be conclusively linked to the incident in question).

¶ 40. Particularly instructive are *State v. Delisle*, 162 Vt. at 311, 648 A.2d at 643, and *State v. Devine*, 168 Vt. 566, 568, 719 A.2d 861, 864 (1998) (mem.). In each of these cases, we found that the pragmatic balancing process favored the State because the defendant had not shown that the State had acted in bad faith, and the defendant had alternative methods of making his case. In *Delisle*, the State kept only a small part of a tarp in which the victim's body was found, and the defendant wanted to use the whole tarp to show that a witness who testified that the defendant had a similar tarp on the day of the victim's death had inaccurately described it. We noted that defense counsel was able to accomplish the same purpose through cross-examination of the witness without the tarp. *Delisle*, 162 Vt. at 311, 648 A.2d at 643; see also *id.* at 311-12, 648 A.2d at 643-44 (loss of victim's hyoid bone that the defendant wanted to use to demonstrate that the victim was not strangled as the State claimed was not significant where defense counsel made the point through cross-examination of the medical examiner).

¶ 41. In *Devine*, the defendant was charged with careless and negligent operation of a vehicle with death resulting and wanted to contest the State's estimate of his speed at impact. He argued that he was unable to do so effectively because the State had destroyed his vehicle before he was charged. We concluded that the State's crash analysis data were sufficient to enable him to present his own expert testimony. *Devine*, 168 Vt. at 568, 719 A.2d at 864.

¶ 42. In this case, the trial court found both that there was no reasonable possibility that the notes contained new evidence favorable to defendant and that pragmatic balancing of the *Bailey* factors showed that there was no violation of Article 10. Without reaching the first conclusion of the court's analysis, we affirm based on the balancing of the *Bailey* factors.

¶ 43. As in *Delisle* and *Devine*, the State did not act in bad faith. The trial court explicitly concluded that the officers acted in good faith, and we have affirmed that conclusion above.

¶ 44. As our analysis of the evidence suggests above, we find this a relatively close case on the evidence presented. Thus, we cannot say that the *Bailey* balancing weighs in favor of the State based on the overall evidence against defendant.

¶ 45. We conclude, however, that the investigatory notes were not important to defendant's case and that their loss did not substantially

prejudice defendant. In part, we reach this conclusion because the trial judge, who listened to the evidence of the officers and judged their credibility, found that the notes contained no additional exculpatory information. We understand defendant's point that the court could make that finding based only upon the self-serving testimony of the officers involved, but we entrust credibility determinations to the judge who hears the evidence.

¶ 46. In any event, the court's finding is not the primary reason for our conclusion. As in *Delisle* and *Devine*, defendant here had alternative means to develop the evidence he desired. Through the liberal discovery available in criminal cases in this state, as well as his own investigation and the evidentiary hearing on defendant's motion, defense counsel could identify and question all witnesses interviewed by the officers and explore in detail their investigatory methods. Using these methods, defendant was able to identify examples of what was missing from the official reports that he argued might be disclosed by the notes. Of course, because defendant already knew that the information was known to the officers, its presence in the notes, or its absence, was relatively unimportant. Indeed, the destruction of the notes aided defendant in his claim to the jury that the officers had conducted a one-sided, incomplete, and incompetent investigation aimed only at convicting him rather than at solving the crime. The court did give some relief that also aided defendant's claim when it instructed the jury that if it found the officers had "either negligently or in bad faith discarded notes . . . you must infer that the information contained in those destroyed notes was unfavorable to the State's case."

¶ 47. We emphasize that the alternatives cited in *Delisle* and *Devine* did not reproduce the lost evidence, but provided methods by which the defendant could make the same point to the jury that would have been made with the lost evidence. Similarly, here, defendant could make those points and impeach the quality of the investigation fairly and effectively. See *Trombetta*, 467 U.S. at 490 (although DUI defendant could not independently evaluate breath sample after the State destroyed it, he could point out all the reasons the analysis machine could give an inaccurate reading).

■ ¶ 48. Defendant argues — to the point of citing articles to the effect that "[l]aw professors and scholars have concluded that lying and deception are widely practiced in police reports" — that the proven omissions from the reports were so numerous and significant that the notes certainly would have shown more deficiencies. He particularly points to the evidence that the officers offered inducements and made

threats to potential witnesses to obtain favorable testimony and never disclosed these inducements or threats, as required, or included them in the reports. Because the offers of consideration and threats came out in pretrial discovery, defendant has made no claim that they provide an independent ground for relief on appeal. Indeed, defendant's ability to detail promises and threats made by police demonstrate the effectiveness of the investigation and discovery process.

¶ 49. We have no doubt that access to the notes could have provided more ammunition with which to criticize the reports and the investigation, but defendant faces a likelihood of diminishing returns. Moreover, we find it unlikely that the notes contain a "smoking gun" of evidence suppression since their purpose was to allow the officer to prepare the written report. Defendant's suspicions do not persuade us that there would be great remaining value in the notes. In the absence of that value, we conclude that balancing of the *Bailey* factors supports the trial court's decision to deny defendant's sanction request.

¶ 50. Defendant's final claim on appeal is that he should be granted a new sentencing hearing because the trial court, in sentencing defendant to fifty years to life, erroneously relied in part upon the aggravating factor that the murder "involved multiple victims." 13 V.S.A. § 2303(d)(6). He argues that the trial court erred in using the definition of "victim" set forth in 13 V.S.A. § 5301(4) — which includes in the definition family members of the homicide victim — and thus concluding that Gendron's widow, two children, and other family members such as his mother and siblings were also "victims."

¶ 51. We agree with defendant that the term "victims" in § 2303(d)(6) refers only to the person killed, and that the court erred in using the definition of "victim" from 13 V.S.A. § 5301(4). First, § 5301(4) of Title 13, which is part of Vermont's victim compensation statutes, is inapplicable here. Not only does § 5301 specifically state that the definition of "victim" contained in § 5301(4) applies only to the word "[a]s used in this chapter," the different natures of this statute and § 2303 require different constructions of their key terms. The main purpose of Vermont's victim compensation law is remedial in nature; it is designed to protect victims of crime and to "ensure that crime victims are treated with the dignity and respect they deserve while functioning in a system in which they find themselves through no fault of their own." *Id.* § 5303(a). As such, the statute should be liberally construed to accomplish its purposes. *State v. Therrien*, 161 Vt. 26, 31, 633 A.2d 272, 275 (1993). In contrast, § 2303 is part of a penal statute, which must be strictly construed

in a manner favorable to the accused. *State v. Oliver*, 151 Vt. 626, 629, 563 A.2d 1002, 1004 (1989).

¶ 52. Second, giving the term an expansive meaning to include family members "would deprecate this [aggravating] factor and render it meaningless. Every time a person is murdered, a spouse, child, parent, sibling or collateral relative loses a loved one. Thus, this enhancement factor would be applied by operation of law . . . ." *State v. Raines*, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994). We thus hold that the term "victims" in 13 V.S.A. § 2303(d)(6) is limited to persons killed and does not include family members of such persons, and that the trial court thereby erred in using that section as an aggravating factor.

¶ 53. We must now consider whether this error has prejudiced defendant such that a remand for resentencing is required. We review the trial court's sentencing decision for an abuse of discretion. *State v. Keiser*, 174 Vt. 87, 101, 807 A.2d 378, 389-90 (2002). Although we deem the consideration of an improper aggravating factor to be an abuse of discretion, see *People v. McAfee*, 774 N.E.2d 469, 473 (Ill. App. Ct. 2002), such consideration does not always require resentencing. See *State v. Bacon*, 169 Vt. 268, 273, 733 A.2d 50, 54 (1999) (applying harmless error doctrine to sentencing proceedings); compare *McAfee*, 774 N.E.2d at 473 (requiring remand for resentencing where appellate court was unable to determine the weight given the improper factor) with *Scott v. State*, 771 N.E.2d 718, 732 (Ind. Ct. App. 2002) (holding that, while trial court erred in applying improper aggravating factor, remaining factors were sufficient for sentence enhancements). Here, the trial court made a significant error in determining the number of victims that could be taken into account in the sentencing decision: while the correct reading of 13 V.S.A. § 2303(d)(6) dictates that there was but one victim in this case, the trial court found at least six — "the deceased's widow . . . , his [two] children . . . , and other family members such as his mother and siblings." The court did not specify the weight given to this factor as compared to the other factors, but it is reasonable to conclude that viewing the crime as having six victims, some of them children, had a significant impact on the court's decision to increase the minimum sentence by fifteen years. While other valid aggravating factors considered by the trial court may have provided an "independent basis for the sentencing decision," *Bacon*, 169 Vt. at 273, 733 A.2d at 54, we cannot reach that conclusion given the court's erroneous interpretation of the "multiple victims" provision of 13 V.S.A. § 2303(d)(6). We thus conclude that a remand is necessary to allow the trial court to reconsider the sentence imposed with a correct interpretation of that provision.

*Defendant's conviction is affirmed. The trial court's determination of defendant's sentence is reversed, and the matter is remanded to the trial court for resentencing.*