NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 105

No. 2015-420

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Criminal Division |
| | |
| Lenore Hayes | April Term, 2016 |

Michael S. Kupersmith and James R. Crucitti, JJ. (motions to suppress and dismiss); A. Gregory Rainville, J. (final judgment)

Franklin L. Paulino, Chittenden County Deputy State's Attorney, Burlington, for
  Plaintiff-Appellee.

Jessica Burke of Burke Law, P.C., Burlington, for Defendant-Appellant.

PRESENT:  Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.    **SKOGLUND, J.**  Following her conditional plea of guilty to a charge of driving while intoxicated (DWI), second offense, defendant appeals the superior court's denial of her motions to suppress evidence from the vehicle stop and dismiss the case.  She argues that there was no reasonable basis for the stop and that, in any event, all evidence should have been suppressed due to the arresting officer's failure to produce a complete video recording of the stop.  We affirm.

¶ 2.    Shortly before midnight on January 17, 2015, a Town of Richmond police officer stopped defendant's vehicle.  The officer eventually had defendant exit the vehicle to perform field sobriety tests and provide a preliminary breath test sample, which revealed a blood-alcohol

concentration (BAC) of 0.135%. The officer then arrested defendant and transported her to the Richmond police station, where she was processed for DWI. After consulting with an attorney, defendant agreed to provide a breath sample, which the Datamaster infrared device analyzed as containing a BAC of 0.127%. Defendant exercised her right to a second test, which revealed a BAC of 0.133%. Defendant also obtained a test kit for an independent blood test.

¶ 3. Defendant was charged with DWI, second offense. She filed a motion to suppress and dismiss, arguing that the stop of her vehicle was unconstitutional because the arresting officer lacked any reasonable suspicion of her having committed a crime or violated any traffic law. Later, she filed a second motion to suppress and dismiss, this time arguing that the State failed to provide her with an uncorrupted video recording of the stop. See 23 V.S.A. § 1203(k) ("A copy of a videotape made of the alleged offense shall be provided to the defendant within ten days after defendant requests the copy and pays a $45.00 fee for its reproduction."); see also V.R.C.P. 80.5(e) ("A copy of a videotape made of the alleged offense and subsequent processing shall be available for purchase by the defendant directly from the law enforcement agency responsible for initiating the action . . . ."); V.R.Cr.P. 16(e) (same). At an April 8, 2015 hearing on the latter motion, the Chittenden Unit of the Superior Court's Criminal Division dismissed the civil suspension of defendant's driver's license based on a standing order in that court with respect to the government's failure to produce a requested copy of a video recording. The court ruled, however, that whether the criminal case should be dismissed warranted further review under the factors set forth in State v. Bailey, 144 Vt. 86, 94-95, 475 A.2d 1045, 1050 (1984), for cases involving lost or undisclosed evidence.

¶ 4. At a later status conference it was revealed that only approximately seven minutes of the recording of the stop could be viewed because the arresting officer had not flipped a toggle switch that would have continued the recording after his cruiser's blue lights were turned off.

¶ 5. A hearing in the criminal matter was held on June 25, 2015. Following the hearing, defendant renewed her motion to dismiss, arguing that if the court concluded that the arresting officer was negligent in not preserving a recording of the stop, it must undertake a Bailey analysis. See State v. Porter, 2014 VT 89, ¶ 29, 197 Vt. 330, 103 A.3d 916 (stating that although "police do not have a duty to collect all evidence that could potentially favor the defense," there could be situations where negligent conduct by police was sufficiently prejudicial to defendant to warrant sanctions, in which case, "the Bailey test is an adequately flexible method to determine the appropriate sanction").

¶ 6. On July 28, 2015, the superior court denied defendant's renewed motion to dismiss, ruling that while the arresting officer was negligent in not preserving a complete video recording of the stop, the Bailey factors did not favor defendant because the recording would most likely not have revealed exculpatory evidence. See Bailey, 144 Vt. at 94-95, 475 A.2d at 1050 (stating that if defendant shows reasonable possibility that missing evidence would have been favorable to defendant, court must balance (1) degree of negligence or bad faith by government, (2) importance of lost evidence, and (3) other evidence of guilt adduced at trial). Moreover, the court noted that although defendant provided a breath sample within two hours of operation that revealed a BAC well in excess of the legal limit, because she later obtained a test kit for an independent blood test she would have an opportunity at trial to challenge the breath test result.

¶ 7. On September 21, 2015, the superior court held a hearing to consider both defendant's original motion to suppress and dismiss, in which she argued that there was no reasonable basis for the stop of her vehicle, as well as her motion to reconsider the court's July 28 decision. Once again, the arresting officer was the sole witness at the hearing. Two days after the hearing, the superior court issued a ruling denying defendant's motions. The court ruled that none of the "three missteps" by defendant while operating her vehicle individually

3

constituted a traffic violation, but that the combination of those actions indicated defendant was not driving attentively and thus justified the officer stopping her vehicle based on a reasonable suspicion that she might be intoxicated. Further, the court denied defendant's motion to reconsider its July 28 order in light of its conclusion that the stop had in fact been lawful.

¶ 8. On appeal, defendant argues that, pursuant to the criteria set forth in Bailey, evidence from the stop should be suppressed and the case dismissed. She also argues that there was no reasonable basis for the stop. In reviewing a denial of a motion to suppress, we will uphold the trial court's findings as long as they are supported by evidence, but we review de novo whether the facts meet the proper standard to justify a stop. State v. Rutter, 2011 VT 13, ¶ 6, 189 Vt. 574, 15 A.3d 132 (mem.).

¶ 9. "A legal investigatory stop is justified if a police officer has a reasonable and articulable suspicion of criminal activity." State v. Pratt, 2007 VT 68, ¶ 5, 182 Vt. 165, 932 A.2d 1039 (citation omitted). Reasonable and articulable suspicion requires "more than an unparticularized suspicion or hunch of criminal activity, but . . . considerably less than proof of wrongdoing by a preponderance of the evidence." Id. (quotation omitted). "Reasonable suspicion is assessed by examining the totality of the circumstances" while "balancing the public's interest in safety against the relatively minimal intrusion posed by a brief investigatory detention." Id. (quotation omitted). We have held that "[r]easonable and articulable suspicions of motor-vehicle violations are sufficient to justify stops." State v. Harris, 2009 VT 73, ¶ 3, 186 Vt. 225, 980 A.2d 785. "As such, we have upheld investigatory stops for suspicion of DUI based on erratic driving." Pratt, 2007 VT 68, ¶ 5. The relevant question is not whether a motor vehicle violation actually occurred, but rather only "whether the officer had a reasonable basis to suspect that a motor vehicle violation was taking place." Rutter, 2011 VT 13, ¶ 10.

¶ 10. Defendant asserts that the stop here could not have been supported by reasonable suspicion because the superior court found no traffic violations and the arresting officer did not

4

allege in his affidavit that he stopped her vehicle based on his suspicion of a possible DWI. As noted above, however, the question is not whether there was actually a traffic violation but rather whether the arresting officer had an objectively reasonable belief that there was a traffic violation. Moreover, we have reiterated "that an officer's subjective intent for stopping a defendant's car is not relevant as long as there is an objectively reasonable basis for the stop." Id. ¶ 16 (concluding "that the protections of Article 11 do not extend to prohibiting law enforcement officers from stopping motor vehicles where there is an objectively reasonable suspicion that a motor vehicle violation has occurred, even if in a particular situation these infractions may appear 'trivial' or the officer's motivation is suspect"); see also State v. Lussier, 171 Vt. 19, 23-24, 757 A.2d 1017, 1020 (2000) ("In determining the legality of a stop, courts do not attempt to divine the arresting officer's actual subjective motivation for making the stop; rather, they consider from an objective standpoint whether, given all of the circumstances, the officer had a reasonable and articulable suspicion of wrongdoing.").

¶ 11.  In this case, the arresting officer testified that he observed defendant nearly hit another car while exiting a store parking lot when she failed to yield the right of way to the other car pulling into the parking lot. He stated that the operator's lack of attention or due regard aroused his suspicion as to her condition, so he followed the vehicle after it left the parking lot. He testified further that, in following the vehicle, he observed that at one point during a left-hand turn the vehicle crossed over the fog line and kicked up dirt along the shoulder of the road, and at another point during a right hand turn the headlights were turned off for a couple of seconds.

¶ 12.  Taken together, defendant's actions were sufficient to create a reasonable and articulable suspicion that defendant may have been driving impaired. Cf. State v. Bruno, 157 Vt. 6, 11, 595 A.2d 272, 275 (1991) (concluding that arresting officer's observations of defendant swerving and drifting in his lane before briefly parking and then operating his vehicle without headlights were sufficient to raise officer's reasonable and articulable suspicion that defendant

5

was driving impaired). In a relatively short period of time, the officer observed multiple indications of defendant's lack of attention while operating her vehicle. Thus, the officer had more than an unparticularized suspicion or hunch of impaired driving. Regardless of whether any one of defendant's "missteps" actually amounted to a motor vehicle violation, the officer could have reasonably believed that there was a traffic violation or that defendant was driving impaired. See 23 V.S.A. § 1243(b) (providing that vehicles operating on state highways between thirty minutes after sunset and thirty minutes before sunrise must display lights).

¶ 13. Defendant argues, however, that the stop should be suppressed and the case dismissed under a Bailey analysis. According to defendant, the stop should be suppressed because of the arresting officer's "active failure to preserve evidence that likely would have been favorable to her." In support of her claim that a complete video recording may have produced exculpatory evidence, defendant contends that the arresting officer claimed in his affidavit that defendant's speech was "confused" but then conceded in his testimony at the September 21 hearing that the word "excited" would be more appropriate—which defendant contends is not a cue for intoxication. Examining the three Bailey factors, defendant further asserts that: (1) as the trial court found, the arresting officer was grossly negligent because on prior occasions unrelated to this case he had failed to flip the toggle switch; (2) a complete video recording was important because she produced evidence demonstrating that the officer's prior recollections were not accurate; and (3) the only other evidence of guilt was the officer's other questionable observations and the evidentiary test administrations.

¶ 14. We discern no basis to overturn the superior court's denial of defendant's motion to dismiss due to the limited video recording. As an initial matter, it is questionable whether Bailey is even applicable under the circumstances of this case, as Justice Dooley explains in his concurrence. In any event, in State v. Dimick, 173 Vt. 547, 548-49, 790 A.2d 435, 436-37 (2001) (mem.), we reversed the trial court's exclusion of all evidence derived from a stop where

the court accepted the defendant's claim that the police had a legal duty to create a video recording of all roadside stops and ensuing field sobriety tests. We concluded that neither the statute requiring police to provide defendants with a copy of a video recording made of the alleged offense, see 23 V.S.A. § 1203(k), nor any police rules or regulations compelled the police to record stops. Dimick, 173 Vt. at 549-50, 790 A.2d at 437. We stated that "[b]ecause the Legislature has chosen not to require officers to tape all major roadside stops, this Court will not create such a requirement by 'judicial fiat.' " Id. at 550, 790 A.2d at 438. The same situation exists in this case. The Legislature has not enacted such a requirement, and the arresting officer testified that no such policy exists within his department.

¶ 15. Defendant's reliance on Porter does not help her. In that case, the defendant, who was convicted of attempted kidnapping, argued that the State's failure to collect or preserve four specific items of potentially exculpatory evidence should have resulted in dismissal of the charges pursuant to Bailey. We rejected the defendant's argument "that the failure to collect evidence in the first place is equivalent to destroying, losing, or failing to preserve exculpatory" because "[t]he police do not have a duty to collect all evidence that could potentially favor the defense." Porter, 2014 VT 89, ¶ 29. We stated, however, that "the Bailey test is an adequately flexible method to determine the appropriate sanction" in situations where the "negligent conduct of police is sufficiently prejudicial to the defense to warrant sanctions." Id. Thus, even though police do not have a duty to collect all potentially exculpatory evidence, the Bailey factors apply in situations where the State's failure to procure potentially exculpatory evidence results in prejudice—for example, failing to procure a bloody knife lying next to a body in a murder case, see State v. Wheelock, 158 Vt. 302, 312, 609 A.2d 972, 978 (1992).

¶ 16. Because we have explicitly held that, absent a requirement in a statute or written police policy, there is no legal duty to record roadside stops, here the officer's failure to record

the stop was not negligent, despite the superior court's finding to the contrary. See Dimick, 173 Vt. at 549-50, 790 A.2d at 437.

¶ 17.    In any event, this is not a case where failure to preserve/produce evidence would warrant sanctions.  Defendant cannot show prejudice here.  First, the alleged negligence was failing to flip the toggle switch, but that did not occur until after the stop and the cruiser's blue lights were turned off.  Thus, the alleged negligence had no impact on the lack of a preserved recording of all of the incidents that led to the stop.  Second, in his affidavit and at the June 25 hearing, the arresting officer testified that when he approached defendant's car after the stop he smelled a very slight odor of intoxicants and observed that defendant's eyes were slightly bloodshot.  A video recording would not have picked up these observations.  Third, the officer further testified that defendant admitted to recently consuming alcohol, that she willingly agreed to perform field dexterity tests, and that the officer observed multiple cues of intoxication based on her performance of those tests.  While a video recording could conceivably have undercut the officer's observations of impairment cues with respect to balance on two of the three tests, there were impairment cues on one of the tests related to eye movement that the recording would not have picked up.  Fourth, defendant agreed to submit to a preliminary breath test, which indicated a BAC well over the legal limit, as did the two evidentiary tests taken at the police station.

¶ 18.    Nor could defendant demonstrate a reasonable possibility that a video recording would have produced evidence in her favor.  See Commonwealth v. Olszewski, 625 N.E.2d 529, 535 (Mass. 1993) (emphasizing that "reasonable possibility" must be "based on concrete evidence and not on mere speculation[,] that the [government's] actions deprived [the defendant] of evidence that would have been favorable to his case").  The record does not support the principal basis for defendant's argument—that a complete video recording of the roadside stop would have produced evidence contradicting the arresting officer's account of what happened. She argues that the officer stated in his affidavit that her speech was "confused"—a cue for

impairment—but that he conceded at the September 21 hearing that he should have described her speech as "excited" rather than "confused." Her point is that since we know the officer inaccurately described a cue for impairment in this instance, there is a reasonable possibility that he also inaccurately described other alleged impairment cues, including those associated with the field dexterity tests. The problem with this argument is that in his affidavit the officer did not describe defendant's speech as confused; rather, he stated that defendant "appeared confused, unable to locate the registration." Thus, at the hearing when the officer described her speech as "excited" rather than "confused," he was not contradicting the statement in his affidavit. In short, even if we were to assume negligent conduct on the part of the officer based on some unexplained duty, defendant cannot demonstrate sufficient prejudice to warrant sanctions per Porter.

Affirmed.

FOR THE COURT:

_____
Associate Justice

¶ 19. **DOOLEY, J.**, **concurring.** I agree that this case should be affirmed on the ground that under State v. Dimick, there is no obligation to tape major roadside stops; thus, I agree fully with the majority decision. 173 Vt. 547, 550, 790 A.2d 435, 438 (2001) (mem.). I write separately to express my belief that the test introduced in State v. Bailey is generally inapplicable in cases where the lost, destroyed, or undisclosed evidence does not involve the ultimate question of guilt or innocence, but instead, bears on the constitutionality of how that evidence was acquired. 144 Vt. 86, 94-95, 475 A.2d 1045, 1050 (1984). This is an additional reason why we should affirm in this case.

¶ 20. There are three factors suggesting Bailey is limited in its application. First, the third element of the Bailey test is the weight of "other evidence of guilt adduced at trial," id. at

9

95, 475 A.2d at 1050, and this element makes sense only if the unpreserved evidence relates only to guilt or innocence. See State v. Porter, 2014 VT 89, ¶ 30, 197 Vt. 330, 103 A.3d 916 (noting that "the Bailey test depends on the evidence of guilt produced at trial"). Second, in the federal case underlying Bailey, the Court of Appeals for the District of Columbia recognized that the Supreme Court of the United States "ha[d] not yet attempted to define" the standard of constitutional coverage of favorable evidence with precision, but nonetheless noted it was the law of the circuit that due process "applies to all evidence which might have led the jury to entertain a reasonable doubt about [the] defendants' guilt," and conducted its analysis accordingly. United States v. Bryant, 439 F.2d 642, 648 (D.C. Cir. 1971) (citation and alterations omitted); see also State v. Gentes, 2013 VT 14, ¶ 5, 193 Vt. 669, 70 A.3d 967 (mem.) (observing that lost-or-destroyed-evidence framework explicated in Bailey was "based on the analysis set forth in the leading federal case" of Bryant).

¶ 21. Third, a review of our case law reveals Bailey has exclusively been utilized in instances where undisclosed evidence directly bore on the ultimate question of guilt or innocence. See, e.g., Porter, 2014 VT 89, ¶¶ 27, 30 (concluding trial court "appropriately applied the Bailey test" in case where potentially exculpatory evidence was blood from victim's face, victim's fingernail clippings, clothes and scrapings, and hair found in her clothing, which went to identity of attacker); State v. Gibney, 2003 VT 26, ¶ 42, 175 Vt. 180, 825 A.2d 32 (affirming trial court's "pragmatic balancing of the Bailey factors" finding there was no violation of Article 10 in police officers' destruction of their investigatory notes); State v. Devine, 168 Vt. 566, 568, 719 A.2d 861, 864 (1998) (mem.) (finding State's destruction of vehicle did not preclude defendant charged with negligent operation of vehicle from contesting State's estimate of his speed at impact); State v. Delisle, 162 Vt. 293, 311-12, 648 A.2d 632, 643-44 (1994) (concluding balancing test favored State in case involving loss of victim's hyoid bone, which defendant wanted to use to show victim was not strangled as state claimed, and tarp on which

10

body was found, which defendant wanted to use to show witness who testified defendant had similar tarp had incorrectly described it, as defendant had other means of making his defense).

¶ 22. In cases such as this, where the missing evidence bears on a collateral or pretrial issue, I would advocate for a return to the federal standard expressed in Arizona v. Youngblood, 488 U.S. 51 (1988). In Youngblood, the Supreme Court established two standards: one for a failure to preserve "material exculpatory evidence," where, as per Brady v. Maryland, 373 U.S. 83 (1963), the good or bad faith of the State is irrelevant, and one for "potentially useful evidence," wherein a denial of due process is only found if a criminal defendant can show "bad faith on the part of the police." Youngblood, 488 U.S. at 57, 58. Bailey preceded Youngblood by four years; accordingly, we concluded it represented the controlling federal standard in State v. Seifert, 151 Vt. 66, 70, 557 A.2d 494, 497 (1989). However, in Delisle, we noted that:

> We believe, however, that Youngblood is both too broad and too narrow. It is too broad because it would require the imposition of sanctions even though a defendant has demonstrated no prejudice from the lost evidence. It is too narrow because it limits due process violations to only those cases in which a defendant can demonstrate bad faith, even though the negligent loss of evidence may critically prejudice a defendant. Because the Bailey test balances the culpability of the government's actions and the prejudice to a defendant, we adopt it as the state constitutional standard.

162 Vt. at 310, 648 A.2d at 643.

¶ 23. Although I remain in accord with the reasoning of Delisle, and believe Bailey is the preferable standard for state constitutional claims, I maintain the narrowness of its scope limits its application to those cases where the missing evidence pertains directly to a criminal defendant's guilt or innocence, such that its absence makes the presentation of a defense more difficult. To that end, I believe that in its extension beyond exculpatory evidence, to all "potentially useful evidence," Youngblood can fill the gap. 488 U.S. at 58.

¶ 24. Youngblood has been used in this manner in other jurisdictions. For example, in State v. Geeslin, the Ohio Supreme Court considered a case where a trooper accidentally

11

recorded over patrol car footage of a defendant's stop, such that the "only relevant events remaining on the videotape relating to [the defendant's] arrest are those that occurred after [the defendant] was stopped." 2007-Ohio-5239, 878 N.E.2d 1, at ¶ 4. The court recognized that the missing evidence "would not have been used for the purpose of establishing [the defendant's] guilt or innocence," but instead, would serve to "challenge or corroborate the justification for the stop." Id. ¶ 12. Because the missing footage was relevant "only with regard to the validity of the stop that led to [the defendant's] arrest," the court concluded it was not materially exculpatory evidence under Brady, but instead, fell into the category of potentially useful evidence. Id. ¶ 13. Accordingly, the Ohio high court applied the second Youngblood test to determine whether the trooper acted in bad faith in recording over the footage. Id. ¶ 14; see also United States v. Houston, 548 F.3d 1151, 1155 (8th Cir. 2008) (applying Youngblood test where officers failed to preserve video evidence of traffic stop); Ellis v. State, 77 So. 3d 1119, 1124 (Miss. Ct. App. 2011) (applying bad faith test to erasure of memory card of defendant's traffic stop); Higginbotham v. State, 416 S.W.3d 921, 926 n.1 (Tex. App. 2013) (observing if defendant could argue State failed to preserve in-car camera recording showing what transpired at arrest in bad faith, he could prevail on claim under Youngblood).

¶ 25. I agree that defendants like the one in the instant case should not be without recourse when seeking to challenge undisclosed, unpreserved, or even "non-created" evidence that bears on suppression of evidence because of the possibility of a constitutional violation. On the other hand, a rule created to implement fully the State's duty to prove guilt beyond a reasonable doubt and fairly disclose exculpatory evidence does not neatly apply in connection with factfinding where the defendant has the burden of proof and guilt is not being determined. Indeed, the real issue is the scope of the exclusionary rule.

¶ 26. I recognize that Vermont has diverged from the federal courts in its development of a broad exclusionary rule. In State v. Oakes, we noted that the United States Supreme Court

12

treats the federal exclusionary rule as "a judicially created remedy rather than a constitutional right," and as such, focuses on weighing the costs and benefits associated with applying the rule in particular circumstances. 157 Vt. 171, 174, 598 A.2d 119, 122 (1991). Instead, we recognized that our state exclusionary rule "effectuates Article 11 rights" and that reliance on an empirical assessment would "disserve those rights." Id. at 175, 598 A.2d at 121; see also State v. Badger, 141 Vt. 430, 453, 450 A.2d 336, 349 (1982) (concluding introduction of ill-gotten evidence at trial "eviscerates our most sacred rights, impinges on individual privacy, perverts our judicial process, distorts any notion of fairness, and encourages official misconduct").

¶ 27. However, application of the exclusionary rule as the appropriate remedy requires "demonstrating a connection between the constitutional violation and the physical evidence seized." State v. Delaoz, 2010 VT 65, ¶ 15, 189 Vt. 385, 22 A.3d 388, superseded by statute on other grounds (noting also that exclusionary rule applies only where challenged evidence "discovered through exploitation of an illegality" and that defendant must show causal relationship between unlawful conduct and discovery of evidence). Accordingly, for a claim based only on a police officer's negligence, with no proof there was actually a constitutional violation, I see no reason to expand the exclusionary rule here. See also State v. Lussier, 171 Vt. 19, 30, 757 A.2d 1017, 1025 (2000) (emphasizing focus of analysis of scope of exclusionary rule "should be on the individual constitutional rights at stake"). I believe Youngblood affords defendant sufficient recourse in the situation present here.

¶ 28. Under the Youngblood standard, defendant in this case must prove that the officer acted in bad faith in failing to turn on the video system. There is no evidence of bad faith and defendant has not claimed it. For that reason, and the reasoning of the majority, I would affirm.

_____
Associate Justice

¶ 29.   **ROBINSON, J.**, **concurring.**   The majority acknowledges our holding in State v. Porter that even in the absence of a duty to collect evidence, the negligent conduct of police may be sufficiently prejudicial to the defense to warrant sanctions, 2014 VT 89, ¶ 29, 197 Vt. 330, 103 A.3d 916, but then without analysis or explanation either implicitly overrules that holding or carves out an exception for videotape evidence—in an era when the significance of such evidence is growing.  This case does not require us to address this question, and, although I concur in the mandate, I cannot join the majority's reasoning.

¶ 30.   This Court has long recognized that even though police do not have a duty to collect particular evidence (as opposed to preserving evidence already collected), " 'there could arise situations in which negligent conduct of the police is sufficiently prejudicial to the defense to warrant' sanctions."  Id. ¶ 29 (alteration omitted) (quoting State v. Wheelock, 158 Vt. 302, 312, 609 A.2d 972, 978 (1992)).  Whether the conduct of police is "negligent" is presumably assessed with reference to the norms of reasonable police investigation, since we have repeatedly recognized that there is no general statutory or constitutional duty to collect particular evidence at a crime scene.  See id. ("The police do not have a duty to collect all evidence that could potentially favor the defense.") (citing State v. Ware, 882 P.2d 679, 683 (Utah Ct. App. 1994) (stating rule that prosecution "generally has no duty to collect particular evidence at the crime scene")).

¶ 31.   In Porter we concluded that the Bailey test—developed to address claims of lost, destroyed, or unpreserved exculpatory evidence—was "an adequately flexible method to determine the appropriate sanction" in the class of cases in which the failure to collect evidence in the first place was sufficiently negligent to warrant consideration of sanctions.  Id.

¶ 32.   In this case, the majority acknowledges Porter, but then holds that because we have held that there is no legal duty to record roadside stops, here the officer's failure to record the stop was not negligent, despite the superior court's finding to the contrary.  Ante, ¶ 16.  The

Court's reasoning that because there is no statutory or constitutional duty to record roadside stops, the failure to do so here could not be deemed negligent and the Bailey analysis is inapplicable is squarely at odds with our reasoning in Porter that even though police have no duty to collect evidence, the failure to do so in a particular case may be so negligent and prejudicial as to warrant consideration of sanctions. It isn't clear whether the majority is implicitly overruling Porter, limiting its reach to the extraordinary circumstance of failure to procure a bloody knife lying next to the body in a murder case, or merely carving out an exception to the Porter analysis for a specific kind of evidence—namely, videotaped evidence of roadside stops. The majority does not offer a rationale for any of these approaches.

¶ 33. I am not warring with our holding in State v. Dimick, 173 Vt. 547, 790 A.2d 435 (2001) (mem.). In that case, we rejected the argument that the Vermont State Police Rules & Regulations, Operational Policies & Procedures created a statutory duty to videotape all roadside stops and DUI sobriety tests. Id. at 549-50, 790 A.2d at 437-38. We noted that the rules merely required officers to tape "whenever possible." Id. at 550, 790 A.2d at 437. I am merely arguing that in this day and age, when dashcam and bodycam videos are becoming such a standard part of policing in many departments,[*] we should not, without far more consideration and analysis, carve this one category of evidence out from the general rule articulated in Porter, which recognizes that in some cases a failure to collect evidence (that officers have no statutory or constitutional duty to collect) may be so negligent with reference to reasonable policing norms and so prejudicial as to warrant further consideration by the Court. Without more information than we have here, I cannot agree that turning off a dashcam or bodycam at a critical moment can never constitute as serious a departure from accepted police practices, and one that is just as prejudicial to a defendant, as failing to collect a critical piece of tangible evidence.

---

[*] On a national basis, in 2013, 68% of local police departments used in-car cameras, up from 61% in 2007, and 32% used body-worn cameras. B. Reaves, U.S. Dep't of Justice, Local Police Departments, 2013: Equipment and Technology 3 (2015), http://bjs.gov/content/pub/pdf/lpd13et.pfd [https://perma.cc/Q8HS-GBAS].

¶ 34. We don't have to take such an extreme step to resolve this case. After concluding, based on the testimony concerning this particular case, that the officer's failure amounted to gross negligence, the trial court applied the Bailey test and concluded that "it would be inequitable to suppress evidence or to dismiss the State's case," but that a corrective instruction to the jury at trial would be appropriate. As the analysis in the last two paragraphs of the majority's opinion reflects, the trial court's conclusion was well supported. The majority could have declined to reach the question of whether dashcam video evidence of a roadside stop is subject to a blanket exemption from the scrutiny called for in State v. Porter on the basis that even if the trial court properly applied the Bailey test, its conclusion that Bailey does not afford defendant the relief she seeks is affirmable. That would have left to another day, and perhaps a case in which we are presented with a record that more thoroughly elucidates the role of dashcam videos in contemporary policing in Vermont, the question of whether an across-the-board exception for videotape evidence is appropriate.

¶ 35. For the above reasons, I concur in the majority's affirmance of defendant's conviction, but do not join the reasoning in ¶¶ 13-16 of the majority opinion.

_____

Associate Justice

16