2007 VT 96

## State of Vermont v. George Dean Martin

[944 A.2d 867]

No. 04-405

Present: **Reiber, C.J., Dooley, Johnson and Burgess, JJ., and Gibson, J. (Ret.), Specially Assigned.**

Opinion Filed September 7, 2007

Motion for Reargument Denied September 27, 2007

*William H. Sorrell*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, and *John T. Quinn*, Addison County State's Attorney, and *Whitney K. Lunsford*, Deputy State's Attorney, Middlebury, for Plaintiff-Appellee.

*William A. Nelson*, Middlebury, and *Rubin Kidney Myer & DeWolfe*, Barre, for Defendant-Appellant.

¶ 1. **Burgess, J.** Defendant was charged, convicted, and sentenced on two counts of boating while intoxicated, 23 V.S.A. § 3323, death resulting (BWI/Fatal), *id.* § 3317(f), after the boat he was operating on July 4, 2002 capsized, resulting in the deaths of two children. On appeal from his conviction and sentence, defendant claims the trial court erred by: (1) finding jurisdiction in Vermont beyond a reasonable doubt; (2) denying defendant adequate voir dire during jury selection; (3) excluding defendant's evidence of the accident's reenactment; (4) excluding evidence that the boat's manufacturer modified the design to correct safety defects in the boat that capsized; (5) instructing the jury incorrectly on the element of causation; (6) calling attention to defendant's failure to testify; (7) ruling that defendant's seven-year-old felony conviction was admissible for impeachment purposes; and (8) allowing him to be convicted and sentenced for more than one offense arising from a single incident, in violation of 23 V.S.A. § 3323(e). We affirm defendant's conviction on a single count of BWI/Fatal, reverse defendant's second conviction, and remand for resentencing.

¶ 2. Following is a brief summary of the facts and evidence at trial. Additional facts are included in the relevant discussions of particular issues. On the night of the capsize, defendant took a group of friends and neighbors onto Lake Champlain in his brother-in-law's boat to watch a fireworks display at Basin Harbor. He drove the boat to a point on the lake near Diamond Island, where he met a friend operating another boat with a group of people aboard. They tied the two boats together to watch the fireworks. After the display, they untied the boats, and defendant turned and accelerated to head back. There was a dispute at trial as to how fast defendant accelerated the boat and

how sharply he turned it, but it was undisputed that the boat immediately capsized. Three children were trapped under the hull. One was saved by rescue efforts, but two children drowned.

¶ 3. The boat at issue was on loan to defendant, and defendant used it six times prior to the accident. Known by its brand name as a MacGregor 26X, the boat was a hybrid sailboat and motorboat. Unlike most sailboats, it lacked a conventional weighted keel protruding from its bottom as ballast to keep it upright. On this model, the stability usually provided by a keel came instead from a ballast tank built into the hull, which could be filled with up to 1400 pounds of water when needed. The boat was designed so that the ballast tank should be filled when operated as a sailboat and normally emptied when operated as a powerboat, except when carrying more than four people aboard — in which case, the manufacturer warned in the manual, the ballast tank should always be filled. The manual also warned not to overload the boat, and recommended a limit of six adults so as not to compromise the boat's stability. The manual further warned that when operated without the ballast filled, passengers should stay off the cabin top and foredeck to avoid instability.

¶ 4. On the evening of the capsize, defendant was operating the MacGregor 26X as a powerboat with eleven people on board — eight adults and three children. One adult was seated on the foredeck and another was standing atop the cabin. The ballast tank was empty. Defendant had never seen the owner's manual. Although the manufacturer typically puts decals on the boat warning about the number of passengers, their location and when to fill the ballast tank, the warnings were missing on this particular boat. Both the State and defense experts agreed that had the ballast tank been filled, the capsize would not have happened.

¶ 5. The manner in which defendant operated the boat just before the capsize was a central dispute at trial. The State's witnesses generally described a more dramatic acceleration and turn than was recalled by defense witnesses. One State's witness, a passenger on the boat to which defendant's boat had been tied during the fireworks display, testified that defendant "gunned" the motor, that she could tell from the white water coming out of the back of the boat that defendant "had almost put it on full throttle," and that defendant turned sharply to the left. She stated that she had "never seen a boat turn so sharply at the same time

as accelerating so quickly." The witness's boyfriend also recalled a hard left turn. Another witness testified that the boat throttled up to eight to ten miles per hour and made a very sharp turn to the left when it capsized. On the other hand, two defense witnesses testified that the boat was moving at a slow walking pace and a five- to six-mile-per-hour walking speed, respectively, as one described a slow left turn and the other felt no change in direction.

¶ 6. Also disputed was whether the boat's instability should have been apparent to defendant. One defense witness described the boat as "tippy," while others, including a State's witness, recalled no problem with the boat's handling. At trial, the State's expert opined that defendant failed to recognize a tippy boat, perhaps as a result of alcohol-impaired judgment, although this expert also agreed that he would not ordinarily expect his own twenty-one-foot ski boat with eleven people aboard to capsize in calm water. Defendant's expert opined that the boat would have appeared normal and that, absent any warning to the contrary, there was no reason to suspect the MacGregor 26X had any potentially unsafe characteristics. At the same time, defendant's expert acknowledged that this boat, without ballast, did not have a lot of stability and would be "very tender" with more than four people aboard, and that its inherent instability could have been obvious to an experienced operator.

## I. Jurisdiction

¶ 7. We begin with defendant's contention that the trial court erred in ruling that the capsize occurred within the jurisdiction of Vermont. The State and defendant stipulated that the State would have the burden to prove beyond a reasonable doubt that the boat was in Vermont waters at the time of the capsize. The parties also jointly requested the court to hear the evidence and decide the jurisdictional issue in a proceeding separate from the jury trial, and defendant waived his right to a jury trial on that issue. After a two-day bench trial, the court concluded that the State had established beyond a reasonable doubt that the boat capsized within Vermont's boundaries. On appeal, defendant contends that the evidence was insufficient to sustain the State's burden of proof. Additionally, defendant argues that the trial court's findings demonstrate that it unconstitutionally shifted the burden of proof to him on the question of jurisdiction.

¶ 8. Our standard of review on the sufficiency of evidence is well established. We must determine if the evidence, viewed in the light most favorable to the State and excluding modifying evidence, fairly and reasonably supports a finding beyond a reasonable doubt that the boat was in Vermont waters at the time of the capsize. *State v. Robar*, 157 Vt. 387, 391, 601 A.2d 1376, 1378 (1991). The evidence supporting the trial court's conclusions "must be examined both for its quality and strength." *State v. Gibney*, 2003 VT 26, ¶ 2, 175 Vt. 180, 825 A.2d 32 (quotation omitted). While evidence that leaves the determination of a disputed fact wholly dependent on conjecture or mere suspicion is insufficient, circumstantial evidence may serve as proof of a fact beyond a reasonable doubt. *Id.* ¶¶ 2, 13. "In assessing circumstantial evidence, the fact-finder may draw rational inferences to determine whether disputed ultimate facts occurred." *State v. Durenleau*, 163 Vt. 8, 12, 652 A.2d 981, 983 (1994).

¶ 9. We briefly summarize the State's evidence. Five members of a rescue group arrived on the scene to assist within roughly thirty minutes of the capsize. All had extensive boating experience and familiarity with the Diamond Island area of Lake Champlain where the capsize occurred. Each rescuer was able to recollect his route to the boat, and each identified the location of the capsized boat as somewhere just north of Diamond Island. Three of the rescuers accompanied the State's witness, Dean George, on the lake sometime after the capsize incident, and each physically located a spot on the water where they recalled the boat was positioned when they arrived on the scene.[1] Mr. George is an auxiliary member of the Marine Division of the Vermont State Police and a retired state police diver. He has extensive boating experience, training on search and recovery operations, experience with the Diamond Island area of the lake, and experience with the use of marine charts, navigational radar and the satellite-based global positioning system (GPS). Mr. George took GPS coordinates of the locations the others identified and mapped them, showing each location close to Diamond Island. The court found these three rescuers to be credible, unbiased and confident in their recollections.

---

[1] The court discounted the testimony of the two other rescuers because neither could offer a precise location of the boat and one had a personal relationship with the family of the victims.

¶ 10. The boundary line between Vermont and New York runs along the middle of the deepest channel of the lake. The court accepted this boundary definition on the basis of testimony from one of the rescuers and Mr. George, and determined this fact to be undisputed. Using depth-measuring equipment and navigational charts, Mr. George located the deepest channel and determined that location to be to the west of all the GPS points identified by the three rescuers, as well as to the west of the GPS location recorded by the Coast Guard when it arrived on the scene some forty-five minutes after the capsize. All of the GPS recordings placed the boat in Vermont waters.[2]

¶ 11. Although there was no direct evidence of the precise GPS location of the boat at the moment it capsized, we conclude that the State's evidence was sufficient for the court to infer beyond a reasonable doubt that the boat was in Vermont waters at the time of the capsize. Defendant argues that the court improperly discounted the uncontested evidence from his expert, a professor of oceanography and limnology — the study of lakes — at Middlebury College, of an ever-present, regularly alternating current in Lake Champlain. It was defendant's theory at trial that the current was moving south the night of the capsize because there was testimony from officers assigned to watch the boat that it had drifted some four miles south within five or six hours after the capsize. Defendant's expert testified that there are currents in the lake that alternate every four to five days from north to south, with brief periods of stagnation. Defendant argues that because of the uncontested existence of ongoing currents in the lake, the court could not determine beyond a reasonable doubt, without speculation or conjecture, that the boat was in Vermont waters at the time of the capsize.

¶ 12. Essentially, defendant asks this Court to weigh the evidence presented by the defense against the evidence presented by the State. It is not our role, however, to act as a fact-finder in

[2] Mr. George testified that the Coast Guard location was .12 miles east of the New York/Vermont border, and the pinpoint location of one of the rescuers was .15 miles east of the New York line. Although Mr. George did not specifically testify about the distance from the border to the positions identified by the two other rescuers, he took readings from both those rescuers and plotted and identified all the recorded GPS locations on a map submitted into evidence. The map reflects the locations identified by the two other witnesses as east of the Coast Guard position and close to first rescuer's recollected position.

determining the sufficiency of the evidence to support a judgment. This Court must determine only whether the State's evidence sufficiently and fairly supports the trial court's findings, excluding any modifying evidence. See *Gibney*, 2003 VT 26, ¶ 14 ("By modifying evidence, we mean exculpatory evidence introduced by defendant, such as countervailing testimony."). We determine whether the State presented substantial evidence to justify the court's inference "irrespective of the evidence adduced by the defendant." *Id.* (quotation omitted).

■ ■ ¶ 13. We disagree with defendant's contention that the court unconstitutionally shifted the burden of proof to him to establish where the boat was at the time of capsize. The trial court's findings of fact and conclusions of law contain no such burden shifting. In its conclusion, the court expressly stated that "the State has established beyond a reasonable doubt that the boat capsized within the boundaries of the State of Vermont." The court concluded the boat was in Vermont waters at the time of capsize solely from the State's evidence, and that defendant's "drift" theory did not create reasonable doubt. Defendant focuses on the trial court's statement that "[t]here is insufficient evidence to tie [the defense expert's] general information about lake currents to the particular time and place at issue here." This statement, however, was in the context of the court's explanation of why it did not credit defendant's evidence over the State's evidence. The court concluded that defendant's theory that the boat could have drifted from New York waters into Vermont waters after the boat capsized was speculation, as opposed to evidence, and particularly noted that the defense expert offered no evidence at all of the currents on the lake at the time and place at issue in this case. Also, the court noted that all the witnesses, other than one of the rescuers who testified that the boat moved north during the time he was on the scene, testified that the lake was flat calm and windless and that they were not aware of the boat's moving at all at the time of the capsize. As the trial court stated, "[t]he court is not required to elevate 'potential explanations . . . to the status of a reasonable doubt.'" (quoting *State v. Murray-Miller*, 143 Vt. 210, 213, 465 A.2d 237, 238 (1983) (per curiam)). The evidence was sufficient for the court to determine beyond a reasonable doubt that the capsize occurred in Vermont waters.

## II. *Jury Voir Dire*

¶ 14. Defendant next claims he was denied the right to adequate voir dire because the trial court did not allow him to question potential jurors individually about their exposure to pretrial publicity. Defendant argues that the court's procedure denied him the voir dire necessary to exercise his statutory peremptory challenges under 12 V.S.A. § 1941 and, accordingly, denied him his constitutional right to a fair trial. We review a challenge to a court's voir dire procedures for abuse of discretion. *State v. Bernier*, 157 Vt. 265, 267, 597 A.2d 789, 790 (1991).

¶ 15. The record indicates the following. The trial court scheduled a one-day hearing for jury selection. Potential jurors were given a questionnaire that morning, which asked, in part, if they had heard or read about the accident and if they had expressed or formed any opinions about the case. Based on the questionnaires, defendant challenged forty-two of the seventy-five jurors for cause, of which challenges the court granted twenty. The court denied the others, stating that further inquiry would be necessary to make a final decision. The court decided to have the attorneys conduct general voir dire, and then hear requests for individual questioning of those jurors to whom defendant objected. At the conclusion of the general questioning, the attorneys met with the judge in chambers, where defendant requested individual voir dire for each juror who indicated exposure to publicity about the case. The judge determined, however, that given the lateness in the day, individual voir dire would not be workable. Instead, the judge decided to ask the remaining group if anything they had heard would affect their views and whether they could put such information aside and rely only on the evidence in the case. None of the potential jurors indicated a problem with putting outside information aside.

¶ 16. We find no abuse of discretion in the trial court's decision not to permit individual voir dire. The record demonstrates that the court considered defendant's request for each juror targeted for individual voir dire. In each case, except for one juror dismissed for cause, the court determined that individual voir dire was not warranted either because the questionnaire responses indicated only exposure to media reports, rather than formation of opinions, or because other responses from these potential jurors during general voir dire adequately demonstrated that no opinions had been formed.

■ ¶ 17. The court carefully considered defendant's requests and properly exercised its discretion. We emphasize that defendant makes no claim that any of the jurors who remained on the panel should have been dismissed for cause; it is only the procedure he challenges. Denial of permission for individual voir dire on the issue of exposure to pretrial publicity was within the judge's discretion and reversible only under "extraordinary circumstances." *Woodmansee v. Stoneman*, 133 Vt. 449, 456, 344 A.2d 26, 30 (1975); see also *State v. Calloway*, 157 Vt. 217, 218-20, 596 A.2d 368, 370 (1991) (holding trial court did not err by refusing to allow counsel to question potential jurors on personal exposure to sexual assault and instead asking all jurors a general question about fairness and impartiality in a sexual assault case). No extraordinary circumstances are shown here that would render the court's procedural decision an abuse of discretion.

### III. *Evidence of Accident Reenactment*

¶ 18. Defendant complains that the trial court's exclusion of his expert witness's reconstruction of the accident, including a videotape of the reenactment, was error. As explained, defendant's primary defense at trial was that the boat did not capsize because of how it was operated, but because of its peculiar and inherent instability at the time of the capsize. Defendant argues that the trial court erred in first ruling on a pretrial motion that evidence of the reconstruction was not expert testimony subject to review under the standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), but was admissible as lay testimony, and then ruling at trial that evidence of the reconstruction was not admissible at all. We review the trial court's evidentiary rulings deferentially and will reverse "only when there has been an abuse of discretion that resulted in prejudice." *State v. Desautels*, 2006 VT 84, ¶ 12, 180 Vt. 189, 908 A.2d 463. We conclude that the trial court did not abuse its discretion in determining that the reenactment was not substantially similar to the actual event and therefore excluding it under Vermont Rule of Evidence 403 based on a balancing of probative value and prejudicial effect.

¶ 19. We briefly recount the procedural context of this issue. Before trial, the State filed a motion in limine to exclude the defense expert from presenting evidence of his accident reconstruction, including a videotape depicting a near capsize, arguing that the testimony would not meet the requisite standards for

relevance and reliability under *Daubert*, 509 U.S. at 589-90. Defendant responded that the expert was a highly qualified naval architect with many years of experience studying boat stability and that his testimony would be relevant, reliable, and necessary for the jury to understand why a twenty-six-foot boat could easily capsize in calm waters under normal operating conditions.

¶ 20. In its pretrial ruling issued four days after the hearing and two days before opening statements, the court noted that the State only challenged the admissibility of the reenactment, not the expert's testimony concerning the instability of the boat. The court agreed with the State that there was no published methodology to support the reenactment as science, and concluded that the testimony on the reenactment was "not expert testimony at all," explaining that it was an experiment anyone could have performed. The court then considered if the evidence should be permitted under V.R.E. 401, 402, and 403. Reasoning that a key issue in the case was whether the capsize resulted from defendant's intoxication, the court found the evidence relevant to the extent defendant could offer a different reason for the capsize. The court concluded that the relevance of the reenactment outweighed the possible prejudice or confusion to the jury. Finally, the court cautioned that it was not ruling in advance on the admissibility of specific information.

¶ 21. At trial, prior to the appearance of defendant's expert, the State renewed its motion to exclude the expert's reenactment testimony, arguing that as a "fact witness," the witness could not opine based on inadmissible hearsay about the necessary evidence of weight, positions, and speed, and therefore there was no foundation from which the jury could understand the relevance of the reenactment. In response, defendant renewed his request that his witness be able to testify as an expert on the reenactment. The court decided to allow the witness to testify about his opinion regarding the boat's design and instability, and then hear a further proffer about the reenactment, in camera, before ruling on the renewed motions.

¶ 22. The expert then testified about his experience as a boat designer and naval architect, including his experience analyzing stability and performance. He explained that he studied the characteristics of the MacGregor 26X, spoke to people who were on board the night it capsized, including defendant, and operated the boat as part of his analysis. He outlined the general stability

characteristics of sailboats and powerboats, and discussed specific characteristics of the MacGregor 26X as a hybrid sailboat-powerboat, explaining the design compromises required between having no ballast for a light and fast powerboat, while satisfying the need for ballast in an otherwise top-heavy sailboat. The expert testified that the need to remove and add ballast to this boat, depending on its use, was unusual, and that a conventional twenty-six-foot sailboat "should never be able to capsize without the sails up." He testified further that having eleven people aboard would not ordinarily be expected to overload a sailboat of this size and that there was nothing apparent from the boat to give "reason to believe that the boat has any potential unsafe characteristics."

¶ 23. The jury then heard defendant's expert testify as to his understanding of how the boat was operated from the time it was untied from the friend's boat until it capsized. He described where he was told the passengers were located, how he understood defendant operated the boat that night, pulling away from the other boat, accelerating, turning left and immediately capsizing. He stated there was no recorded speed, but from people's comments, he understood the boat to be going somewhere between five and eight knots (approximately six to nine miles per hour).

¶ 24. The court then excused the jury and heard further testimony about the expert's reenactment. The expert described loading the boat with substitute weights for passengers, with the same two adults positioned on the foredeck and cabintop as they were on the night in question. The expert described that when operating the boat at modest speeds without turning, it appeared to be stable, but application of "moderate" throttle while turning the wheel resulted in an immediate capsize. To simulate the other passengers, the expert placed garbage cans of water in locations according to descriptions by others. Concerning their weight, the expert explained that the known and established weights of the two adults atop the cabin and foredeck were critical to stability, but that the unknown or estimated weights of persons below and in the rear of the cabin were less significant. The expert agreed that it was important to know the weights of all the passengers, opining that a 10% discrepancy would not have affected the outcome, but a 20% disparity could have made a difference. The expert acknowledged further that he did not know how much

throttle defendant applied, nor how much defendant turned the boat.

¶ 25. After this voir dire, the court denied defendant's renewed motion that the witness be allowed to testify as an expert on the reenactment, and concluded that the witness could not testify as a nonexpert fact witness about what he did and directly observed during the reenactment. Relying on several out-of-state cases, the court concluded that the relevant legal inquiry for admissibility of reenactment evidence generally is whether the reenactment was conducted under conditions substantially similar to those existing at the time of the event in question, otherwise the evidence would be excluded as irrelevant and likely to mislead the jury. See *Loevsky v. Carter*, 773 P.2d 1120, 1125 (Haw. 1989) ("[W]hen a test or experiment is an attempt to reenact the original happening, the essential elements of the experiment must be substantially similar to those existing at the time of the accident.") (quotation omitted); *State v. Leroux*, 584 A.2d 778, 780-81 (N.H. 1990) (holding that trial court could properly have found testimony explaining a videotaped reenactment was substantially more likely to mislead the jury than to be probative under Rule 403). Even allowing for additional evidence offered on passenger weight, the court found the available foundation inexact, speculative and not clearly established. After considering the expert's testimony before the jury, his voir dire testimony, the State's new objection to hearsay and the cure proffered by the defense, the court found "under Rule 403 that the likelihood of confusing and misleading the jury outweighs" what the court then saw "as a rather limited probative value," and so excluded the reenactment evidence.

¶ 26. Defendant argues that the trial court misapplied the *Daubert* standards for expert witnesses, adopted by this Court in *State v. Streich*, 163 Vt. 331, 342-43, 658 A.2d 38, 46-47 (1995), in its pretrial ruling that defendant's expert could testify regarding the reenactment only as a lay witness. Defendant further argues that the court's mid-trial ruling erroneously excluded the reenactment evidence altogether for lacking probative value despite the fact that the reenactment was substantially similar to the actual event. We conclude that the trial court did not abuse its discretion in excluding the reenactment under Rule 403 and therefore do not reach defendant's argument concerning the trial court's failure to apply *Daubert*. See *United States v. Ramirez-Robles*, 386 F.3d 1234, 1246 (9th Cir. 2004) (holding that because Rule 403 and

*Daubert* act independently, reviewing court need not consider trial court's application of *Daubert* if evidence was properly excluded under Rule 403).

■ ■ ¶ 27. We have not specifically addressed the issue of pretrial reenactments before, but we agree with the trial court that the correct inquiry is whether the experiment was conducted under substantially similar conditions.[3] This standard has been adopted by the vast majority of jurisdictions for all pretrial experiments. 1 McCormick on Evidence § 202, at 820 n.15 (6th ed. 2006) (collecting cases). The standard is flexible, and whether conditions are substantially similar "depends on the purpose for which the experiment is introduced." *United States v. Jackson*, 479 F.3d 485, 489 (7th Cir. 2007); see also *Hermreck v. State*, 956 P.2d 335, 339 (Wyo. 1998) ("Substantial similarity does not require identity of conditions, but only that degree of similarity which will ensure that the results of the experiment are probative."). "The requirement is at its strictest when the experiment expressly seeks to replicate the event in question to show that things could (or could not) have happened as alleged." 1 McCormick on Evidence, *supra*, § 202, at 821. Some courts have gone so far as to say that "if the purpose is to recreate an event, the timing and physics of which are critical, courts will only admit evidence of experiments that are conducted under nearly identical conditions as the actual event." *Jackson*, 479 F.3d at 489. But see *Jodoin v. Toyota Motor Corp.*, 284 F.3d 272, 279 (1st Cir. 2002) (" 'Virtually identical' is an incorrect standard."). Courts should also be particularly wary of using video evidence of reenactments, given their "lasting visual impression upon the jury." *Loevsky*, 773 P.2d at 1126.

---

[3] We have applied this standard to other evidentiary situations in which proffered evidence sought to demonstrate a point by re-creation or analogy. See *Mobbs v. Cent. Vt. Ry.*, 155 Vt. 210, 226-27, 583 A.2d 566, 575 (1990) (requiring a showing of substantially similar conditions before allowing evidence of history of accidents at a railroad crossing); *State v. Winters*, 102 Vt. 36, 48, 145 A. 413, 417 (1929) (allowing arrangement before jury of evidence gathered at crime scene in same relative positions as it was found when arrangement, while not exact, was presented with "substantial accuracy"); *Ranney v. St. Johnsbury & L. C. R.R.*, 67 Vt. 594, 599-600, 32 A. 810, 812 (1895) (excluding evidence of similar practices for discharging train passengers by other railroads when the "proposed evidence did not contain all the elements needed to show a substantial similarity of management under substantially similar circumstances").

■ ¶ 28. The pretrial experiment proffered by defendant to demonstrate the boat's propensity to capsize under certain conditions, like most accident reenactments, was greatly influenced by timing and physics. Accordingly, the trial court properly scrutinized the accident reenactment for similarity of conditions. See, e.g., *Swajian v. Gen. Motors Corp.*, 916 F.2d 31, 36 (1st Cir. 1990) (affirming exclusion of videotaped demonstration of car's ability to stop safely after axle breaks as not substantially similar when driver was professional who knew to expect axle break and test was performed at controlled facility); *Jackson v. Fletcher*, 647 F.2d 1020, 1026-28 (10th Cir. 1981) (reversing admission of experiment purporting to recreate accident between a car and a truck to determine speed of truck when simulation truck was different model year and lacked the full load carried in actual truck); *Love v. State*, 457 P.2d 622, 628 (Alaska 1969) (reversing admission of experiment to prove a boat's drift when differing conditions affecting drift were too great to be substantially similar); *Carr v. Suzuki Motor Co.*, 655 S.W.2d 364, 365 (Ark. 1983) (reversing admission of videotape evidence of operating motorcycle with one bad shock absorber to rebut plaintiff's theory that accident was caused by bad shock absorber when reenactment used professional driver and did not duplicate height of jump taken in actual accident); *People v. Bonin*, 765 P.2d 460, 482-83 (Cal. 1989) (finding error in admission of evidence of an experiment wrapping t-shirt around arm to show that ligature marks on neck could have come from strangulation by t-shirt absent proof that arm and neck were similar in relevant aspects and that pressure was applied in similar manner); *Loevsky*, 773 P.2d at 1125-26 (reversing admission of videotaped motorcycle accident reenactment when numerous differences between reenactment and actual occurrence were present, including amount of gravel on the road and angle of turn); *Leroux*, 584 A.2d at 780-81 (affirming exclusion of a videotaped reenactment of intoxicated person exiting a vehicle when reenactment used different model car, different person exiting the vehicle, and person was sober).

■ ¶ 29. Defendant concedes that some conditions could not be exactly recreated in the experiment, but contends that the similarity was substantial enough to warrant admission. We conclude that the court acted within its discretion in concluding that the probative value of the reenactment evidence was outweighed by its potential for unfair prejudice and likelihood to confuse and

mislead the jury. In conducting a Rule 403 balancing, the trial court has broad discretion and we will not overturn its decision unless the court completely withheld its discretion or exercised it on clearly untenable or unreasonable grounds. *State v. Shippee*, 2003 VT 106, ¶ 13, 176 Vt. 542, 839 A.2d 566 (mem.). In assessing the probative value of the reenactment, the court explained that the accuracy of the depiction was not settled. For example, the expert could not, or did not, exclude the impact of material weight deviations in his reenactment. In addition, the necessary foundation facts of speed, turning, and acceleration were not only debatable, but objectively incalculable by defendant's expert. Furthermore, the expert's opinion that the boat was inherently and deceptively unstable, and likely to capsize with only slow or modest turning and acceleration as described by the defense witnesses, was heard by the jury and did not depend on the reenactment.

 ¶ 30. On the other hand, introduction of the reenactment evidence — requiring extensive witness voir dire to determine facts, such as passenger weights, speed, rate of acceleration and degree of turning — would have diverted the jury's attention from the facts of the case to the facts of the reenactment. While the similarity of the reenactment to the accident could be no more resolved than the disputed facts underlying the criminal charge, the video could reasonably be expected to leave a dramatic and vivid impression on the jury quite exceeding the certainty of its foundation. As another court observed, evidence of out-of-court experiments "should be received with caution, and only be admitted when it is obvious to the court, from the nature of the experiments, that the jury will be enlightened, rather than confused." *Hisler v. State*, 42 So. 692, 695 (Fla. 1906) (finding error in the trial court's failure to exclude prosecution's target-shooting experiment to show buckshot patterns inconsistent with murder defendant's description of firing a scattergun in self-defense, when the prosecution did not establish substantial similarity between the guns, their loads and angle of fire). Similarly, courts recognize that "[b]ecause of the indelible impressions that are likely to result from videotaped and other filmed evidence, such evidence must be subject to careful scrutiny." *State v. Wilson*, 637 A.2d 1237, 1245 (N.J. 1994) (citing 2 McCormick on Evidence, *supra*, § 214, at 19, "discussing difficulty of limiting impressions resulting from 'extreme vividness and verisimilitude' of pictorial

reenactments"). The court's determination that the video and reenactment testimony were substantially more likely to mislead and confuse the jury, than be probative of how defendant actually handled the boat, was not untenable.

¶ 31. On a final note, we address defendant's argument that he was entitled to rely on the court's pretrial ruling that the evidence could be presented. The trial court expressly stated in the ruling that "the court is in no way ruling in advance on the admissibility of specific details of the testimony." The court did not rule that the evidence would be unconditionally admissible. Any reliance defendant formed that he would be able to show the videotape, in light of the court's caution that his expert might not be able to testify to the underlying facts shown on the videotape, was misplaced. Defendant could not have reasonably expected the videotape evidence to be admitted absent necessary foundational testimony.

## IV. *Evidence of Design Modifications*

¶ 32. Defendant claims error in the trial court's decision to exclude evidence of remedial measures taken by the boat manufacturer to improve the vessel's stability. The State moved in limine to exclude evidence of the manufacturer's introduction of a new model, the MacGregor 26M, which included some permanent ballast added in the hull and a buoyant mast. The State argued that such evidence would not be probative as to either the stability of the 26X model used by defendant or the effect of defendant's operation, and would cause jury confusion and be unduly prejudicial. Defendant responded that the manufacturer's modifications were relied upon by his expert to support his opinion that the 26X was unstable, and should therefore be admissible as a basis for the expert's conclusion. The court granted the State's motion, concluding that defendant was offering the evidence to place blame for the accident on the manufacturer and that such evidence was inadmissible under "[t]he principle of V.R.E. 407," which bars evidence of subsequent remedial measures offered to prove design defect or third-party fault. We agree with defendant that Rule 407 does not control, but conclude nonetheless that the error was harmless because the evidence was otherwise properly excluded. See *Fuller v. City of Rutland*, 122 Vt. 284, 287, 171 A.2d 58, 60 (1961) (explaining that "we will affirm

a ruling of a trial court upon any legal ground shown by the record, even though the ground may not have been raised below").

 ¶ 33. Whether the trial court actually applied Rule 407, or merely its principles by analogy, we write to make clear that the rule's exclusion of evidence of subsequent remedial measures is inapplicable to the actions of persons not parties to a case. Rule 407 bars the admission of subsequent remedial measures to prove negligence, culpable conduct, product defect or need for warning, and could literally apply to a situation in which a criminal defendant seeks to show that a design defect was the cause of an accident underlying the alleged offense. The purpose of the rule, however, is to further the public policy of "encouraging potential defendants to take safety precautions without fear that this will be used as evidence against them." 2 Weinstein's Federal Evidence § 407.03[1] (2d ed. 2006). Accordingly, courts hold that Rule 407 generally does not bar evidence of remedial measures taken by a nondefendant on the theory that the policy goal is not furthered by such exclusion. *Diehl v. Blaw-Knox*, 360 F.3d 426, 430 (3d Cir. 2004) (collecting cases); 2 Weinstein, *supra*, § 407.05[2]. At least one court has questioned whether Rule 407 could or should ever be applicable in a criminal case. See *United States v. Gallagher*, No. 89-00272-03, 1990 WL 52722, at *2 (E.D. Pa.) (unreported mem.) ("The court finds no legal authority or policy reasons supporting application of Rule 407 in a criminal action, and concludes that it is inapplicable."). We need not go so far here; it is sufficient to state that Rule 407 does not apply to evidence of remedial measures taken by a nonparty.

¶ 34. The trial court's exclusion of the proffered redesign of the boat was nevertheless justified by the potential for undue prejudice and confusion relative to the low probative value of the evidence. The evidence of remedial measures was that the new model 26M added 300 pounds of permanent ballast "to enhance the stability" and a sealed, foam-filled mast as a "powerful buoyancy chamber if the boat is knocked down." Defendant proffered these design changes as a basis for his expert's opinion that the boat was unstable as originally built, when loaded as it was and unballasted, and also as a basis to cross-examine the State's expert who was expected to testify as to the boat's stability.

¶ 35. The evidence was unnecessary to either purpose, and was more ambiguous or confusing than relevant. Based on his initial

and second reports, as well as his pretrial testimony concerning the boat's inherent instability, the defense expert's opinion depended not at all upon subsequent design modifications. Rather, the expert drew his conclusions from his own experience in marine design, his examination of the boat, application of the laws of physics, declarations on the manufacturer's website, as well as the manufacturer's instructions expressly warning against operating the boat without ballast with more than four persons aboard due to the danger of capsize.

¶ 36. In fact, most if not all of the defense expert's opinions about the boat's instability, without ballast, being aggravated by the number, weight and placement of the passengers preceding the fatal capsize, were confirmed by the manufacturer's literature. Although the State's expert opined that failure to operate the boat as it was intended caused the capsize, this expert agreed that stability was diminished by the number of passengers combined with the failure to fill the ballast tank. Instability being undisputed by both experts, there was no need to bolster one, or confront the other, with evidence of subsequent remedial measures.

¶ 37. It is not apparent that the evidence proposed — of a little added ballast and a buoyant mast — is relevant as "remedial measures." No evidence reflects that either modification would have made any difference in the events underlying this case. Defendant offered nothing to suggest that adding 300 pounds of permanent hull weight remedied any instability found by defendant's expert from the lack of 1400 pounds of ballast,[4] or that increased mast buoyancy was germane to any factual issue in the case, so as to be relevant under Rule 401.[5] Introduction of either or both of the design changes, without connection to the events at issue, risked an unfounded diversion of the trial and the jury's attention from the actual circumstances of the capsize to unex-

---

[4] Defendant's expert actually intimated to the contrary in his testimony, testifying that, without ballast, the boat was a "very very light boat," ranging in weight from "2400 pounds" to "somewhere in the neighborhood of 2500 pounds," a 100-pound difference, and that omitting up to 10% of an estimated 1400 pounds of passenger weight, while testing stability, another 140 pound difference, would make no difference in the result of his reenactment.

[5] " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." V.R.E. 401.

plained and collateral manufacturing decisions made after the fact. Indeed, the potential for confusion in evidence of remedial measures is recognized because of their potential for unfair prejudice and low probative value. 2 Weinstein, *supra*, § 407.03[2]; 2 Federal Rules of Evidence Manual § 407.02[3] (8th ed. 2002) (explaining that "more persuasive basis for [Rule 407] is that subsequent remedial measures are of marginal relevance in assessing the defendant's liability, and that this marginal relevance is almost always substantially outweighed by the risk of jury confusion"); see also *Keller v. United States*, 38 F.3d 16, 31 (1st Cir. 1994) ("At best, subsequent remedial measures are considered marginally probative of prior negligence."). In this case, where Rule 407 was inapplicable to exclude evidence of corrective action, the same evidence lacked relevance under V.R.E. 401. If marginally relevant to the proposition of boat instability under the circumstances, as agreed by the defense and State experts, and confirmed by the manufacturer, the evidence still lacked sufficient probative value to outweigh its likely confusing, unduly prejudicial, time-wasting or cumulative effect, and was properly excludable under Rules 402 and 403.

## V. *Jury Instructions on Causation*

¶ 38. Defendant claims that the court improperly charged the jury on causation. Defendant requested that the jury be instructed that it could find defendant guilty only if it found beyond a reasonable doubt that his intoxication was the sole cause of the children's death and that defendant must be found not guilty if the instability of the boat "caused in part the accident." Defendant argued at trial that his proposed statement of the law was consistent with this Court's application of "direct causation." *State v. Yudichak*, 151 Vt. 400, 403, 561 A.2d 407, 409 (1989) (citing *State v. Rounds*, 104 Vt. 442, 453, 160 A. 249, 252 (1932)). In the context of a prosecution for DUI/Fatal and negligent driving, death resulting, we explained that "[t]he jury must . . . find that the [illegal] act or natural result of the act of the defendant is *the* cause of death; not merely *a* cause of death." *Id.* Defendant also contends that the instruction was erroneous for failing to require a nexus between intoxicated operation and the victims' deaths. We find no error on the first claim and conclude the second claim was not preserved for appeal.

¶ 39. We review the jury instructions in their entirety to determine if they "sufficiently guided the jury" and did not

prejudicially impact their deliberations. *State v. Muscari*, 174 Vt. 101, 109, 807 A.2d 407, 414 (2002). The standard of review is whether, "taken as a whole," and not piecemeal, "the instructions . . . breathe the true spirit of the law, such that the jury has not been misled." *Id.* We will reverse only if the charge undermines confidence in the jury's verdict. *State v. Brown*, 2005 VT 104, ¶ 43, 179 Vt. 22, 890 A.2d 79. To preserve an objection to a jury instruction, a party must object to the charge before the jury retires. V.R.Cr.P. 30. Even if the substance of an objection is made during charge conferences, counsel must object following the charge and before the jury retires so that the trial court has an opportunity to correct any errors. *State v. Covino*, 163 Vt. 378, 380-81, 658 A.2d 916, 917-18 (1994).

¶ 40. Defendant's first claim is that the trial court's instruction failed to incorporate a direct causation standard. Defendant acknowledges that *Yudichak*'s seeming declaration of direct causation to the exclusion of all other contributing factors may be overstated, and we conclude that it is. The defendant in *Yudichak* argued that his DUI did not cause the accident, but that he was forced off the road by another driver's negligence, and the trial court's jury instructions allowed him to be convicted despite this "intervening cause." 151 Vt. at 402, 561 A.2d at 409. We held that "[a]n 'efficient intervening cause' of death that is not the result of defendant's acts would require a verdict of not guilty." *Id.* at 403, 561 A.2d at 409 (citation omitted). Our holding was limited by our previous explanation in *Rounds*, cited in *Yudichak*, that defendant's "unlawful acts need not be the *sole* cause of death; it is sufficient if they were a contributory cause." *Rounds*, 104 Vt. at 453, 160 A. at 252 (emphasis added). In context with the entire opinion in *Yudichak*, our statement that DUI/Fatal culpability required a defendant's illegal action be "the" cause, rather than "a" cause, of death, meant to reiterate that "where defendant's unlawful act is established in the chain of direct legal causation he is criminally responsible for the course of events which naturally follow from that act, unless the act of another breaks the chain of causation of the original negligent actor." 151 Vt. at 403, 561 A.2d at 409 (quotations omitted). Thus, the court correctly instructed that defendant's actions must be a cause, rather than the sole cause, of the accident.

¶ 41. Next, defendant argues that the jury instruction was erroneous for failing to require a nexus between intoxicated

operation and the victims' deaths. We conclude that defendant failed to preserve this argument for appeal. During the trial, the court held several charge conferences where defendant requested that the court instruct that the jury must find that defendant's impaired operation caused the capsize. Based on these conversations, the court drafted its instructions. After the court charged the jury, defendant listed several objections to the jury instructions.

¶ 42. On appeal, defendant claims that a general objection to the court's instruction sufficiently preserved the issue for appeal. We find otherwise. None of defendant's objections related to the link between defendant's intoxication and the accident, and furthermore we find no general statement of objection to the charge. We have explained that "failure to object to an instruction after it is given to the jury is considered a waiver of any error even if the substance of the objection is made known before the jury charge." *State v. Wheelock*, 158 Vt. 302, 306, 609 A.2d 972, 975 (1992). This rule allows the trial court an opportunity to avoid the error, and it facilitates our review because objections during charge conferences may be lengthy and vaguely worded. *Id.* "By requiring post-charge objections, counsel is forced to focus on a succinct recitation of specific itemized objections enabling this Court to understand what defendant intended to preserve for appeal." *Id.* Because this issue was not included in defendant's post-charge objections, it was not preserved for appeal.

## VI. *Defendant's Right Not to Testify*

¶ 43. Defendant next argues that the court committed reversible error by instructing the jury regarding defendant's exercise of his right not to testify, after defendant requested that such an instruction not be given. Defendant concedes that under *Lakeside v. Oregon*, 435 U.S. 333 (1978), the instruction did not violate the Fifth Amendment of the United States Constitution, but he asserts that the instruction violated 13 V.S.A. § 6601 and Chapter I, Article 10 of the Vermont Constitution.[6] We conclude, however,

---

[6] In *Lakeside*, the United States Supreme Court observed that it may be unwise for a trial judge to give the cautionary jury instruction when a defendant objects to it, but nevertheless held that "the giving of such an instruction over the defendant's objection does not violate the privilege against compulsory self-incrimination guaranteed by the Fifth and Fourteenth Amendments." 435 U.S. at

that the Vermont Constitution provides no greater protection than the Fifth Amendment on this issue, and that the trial court's instruction was not prejudicial nor does it warrant reversal.

¶ 44. After the court presented the parties with a draft of proposed instructions, including a warning that defendant's right to silence was not to be held against him, defendant requested that the court remove any mention of defendant's failure to testify. The court agreed, but the section was mistakenly left in the copy that was read to the jury. In the course of reading the full instructions to the jury, the court began the section by saying, "You may have observed that the defendant did not testify in this case." The instruction was then interrupted and a bench conference ensued. Defendant, believing that the harm sought to be avoided was already done, requested that the court add further language to stress that declining to testify cannot weigh against the defendant. The instruction, as read to the jury, was:

> You may have observed that the defendant did not testify in this case.
>
> . . . .
>
> A defendant has a constitutional right not to testify. The fact that he did not testify in this case must not be held against him. His decision not to testify raises no presumption of guilt and you must not draw any unfavorable inferences from it. You still must presume him innocent unless and until he is proven guilty beyond a reasonable doubt.

Defendant does not argue legal error in the instruction, only that the court erred in giving the instruction at all.

¶ 45. The instruction did not violate Vermont's constitutional protection that an accused shall not "be compelled to give evidence against oneself," Vt. Const. Ch. I, Art. 10, under our long-settled understanding of that clause. The substance of Article 10 dates from Vermont's first constitution of 1777. See *State v*

---

340-41. The Court rejected the defendant's argument that giving the instruction was "like waving a red flag in front of the jury," finding this assertion premised on an "indulgence in two very doubtful assumptions" that (1) jurors would not notice the defendant did not testify absent the instruction, and (2) jurors would disregard the instruction not to give weight to the defendant's failure to testify. *Id.* at 340.

*Baker*, 115 Vt. 94, 98, 53 A.2d 53, 56 (1947). This Court held in *Baker* that prosecutorial comment and court instruction on a defendant's failure to testify did not violate Article 10. 115 Vt. at 107, 53 A.2d at 61. As *Baker* explained, eighteenth-century criminal defendants were deemed by law to be incompetent and not permitted to testify at trial when Article 10 was written,[7] so the drafters of Article 10 were unlikely to have contemplated its application to defendants declining to testify. *Id.* at 98-100, 53 A.2d at 56-57. What the framers intended to guard against in Article 10, according to *Baker*, was inquisitional torture and Star Chamber-type proceedings to force defendants to take oath against themselves, and not the more nuanced tactical or "moral coercion" presented by the risk of not testifying when offered the choice to do so. *Id.* at 105-06, 53 A.2d at 59-60.[8] Where there is no violation of Article 10 in telling a jury that it may consider a defendant's silence, there cannot be a violation of the same clause when the trial court here explicitly warned the jury that it was *not* to consider the defendant's silence against him.

¶ 46. Having concluded that a cautionary instruction read to the jury over objection of the defendant is not a constitutional violation, we consider whether the instruction violated defendant's rights under 13 V.S.A. § 6601. Section 6601 provides that "the failure of [the defendant] to testify shall not be a matter of comment to the jury by either the court or the prosecutor and shall not be considered by the jury as evidence against him." Given a literal interpretation, § 6601 would always prohibit the court from making any comment about a defendant's failure to testify, even to instruct the jury not to consider a defendant's failure to testify. We long ago read § 6601 as prohibiting only comments that would invite negative inference and allowing instruction that the jury should make no inference. In *State v. Goyet*, this Court held that it was not a violation of the

---

[7] The right to testify was extended to criminal defendants in Vermont by Public Act No. 40, § 1, 1866 (predecessor to 13 V.S.A. § 6601).

[8] *Baker*'s ruling is no longer controlling in light of *Griffin v. California*, 380 U.S. 609, 613 (1965) (holding that state prosecutor violated Fifth Amendment by telling jury that a defendant's failure to testify supports an unfavorable inference against him), and the 1955 statutory amendment. 1955, No. 98.

statute[9] for the court to give a cautionary instruction, even if not requested by the defendant:

> How is the jury to know that such failure [to testify] shall not be considered as evidence against the respondent unless the court tells it so in the language of the statute? Was it the intention of the Legislature, that a jury should be allowed, in its deliberations to speculate about it? Undoubtedly, the members of the jury, or some of them would do so and such failure would be a matter of discussion in the jury room. We do not think that the Legislature had that intention and thus, without any instruction from the court, leave the matter open for the jury with no guide as to the law.

120 Vt. 12, 71, 132 A.2d 623, 659 (1957). Even before *Lakeside* it was established "in our state and [Second Circuit] federal jurisdiction . . . that 'The judge's volunteering of a correct instruction as to a defendant's failure to take the stand is not reversible error, although it is better practice not to give it unless requested by a defendant.'" *State v. Emrick*, 129 Vt. 330, 331, 278 A.2d 712, 712 (1971) (citations omitted). While we have held, on no other basis except noncompliance with § 6601, that failure to give the instruction when requested by a defendant is reversible error, *State v. Persuitti*, 133 Vt. 464, 466-67, 346 A.2d 208, 209 (1975), we see no reason that the converse need be so. The purpose of the statute, and sole rationale for reversal in *Persuitti*, was to vindicate the accused's right to remain silent. The cautionary instruction given in this case, even if accidental, served exactly the same purpose. Absent any showing of actual prejudice, we continue to hold that while the preferred practice would be to follow the defendant's tactical election, the cautionary instruction concerning a defendant's failure to testify "when correctly given is not prejudicial error." *Emrick*, 129 Vt. at 332, 278 A.2d at 713.

## VII. *Admissibility of Prior Stolen Property Conviction*

¶ 47. Defendant next argues that the trial court erred by ruling pretrial that a seven-year-old federal felony conviction for knowingly transporting stolen property would be admissible for im-

[9] The statute then codified as 1947 V.S. § 2412, as amended by 1955, No. 98, is the current 13 V.S.A. § 6601.

peachment purposes if defendant chose to testify.[10] Defendant posits that the age and type of the convictions, and the fact that the underlying misconduct actually occurred more than twelve years before trial, rendered them insufficiently relevant or probative for impeachment. The State responds first, that the issue was not preserved under *Luce v. United States*, 469 U.S. 38 (1984), because defendant did not, in fact, testify, and second, the trial court's decision was not an abuse of discretion. We decline to reach the preservation question because the issue can be more readily decided on an evidentiary basis. See *State v. Setien*, 173 Vt. 576, 577, 795 A.2d 1135, 1137-38 (2002) (mem.) (declining to reach preservation question when record was sufficient to find no abuse of discretion).

¶ 48. The trial court has discretion in deciding whether to allow the use of prior convictions to impeach a testifying defendant. *State v. Emerson*, 149 Vt. 171, 178, 541 A.2d 466, 470 (1987). When the prior crimes do not involve untruthfulness or falsification,[11] V.R.E. 609(a)(2) allows admission of convictions for impeachment purposes only if "the probative value of [the] evidence substantially outweighs its prejudicial effect." The court must assess probative value and prejudice according to a balancing test enunciated in *State v. Gardner*, 139 Vt. 456, 460-61, 433 A.2d 249, 251-52 (1981). *Gardner* instructs that it is important that the trial court "exercise its discretion most carefully" in a criminal case where the witness subject to impeachment is the defendant, and it sets forth a variety of factors to be weighed on admissibility. *Id.* These include the nature of the prior conviction, recognizing, for example, that crimes of violence "are less relevant to the credibility of a witness than crimes involving dishonesty or falsehood," and that the greater the resemblance of the prior crime to the offense charged, the greater the potential for prejudice. *Id.* Also to be considered are the length and age of the criminal record, given the risk of prejudice from a lengthy recitation of prior convictions and the arguably lesser relevance of

---

[10] Although defendant was apparently found guilty of four counts of violating 18 U.S.C. §§ 2, 2314 (liable as a principal for transporting property knowing it was stolen), the State proffered, and the court considered, these offenses as a single conviction.

[11] The trial court concluded that the conviction was not for a crime involving untruthfulness or falsification. That holding is not challenged on appeal.

older crimes to current credibility. *Id.* at 461, 433 A.2d at 251-52. The trial court must also evaluate the relative importance of the defendant's testimony and whether defendant has any means of defense save his or her testimony, the State's need for impeachment and whether impeachment by other than prior conviction is available. *Id.* at 461, 433 A.2d at 252. Failure to balance these factors is reversible error, *State v. Ashley*, 160 Vt. 125, 129, 623 A.2d 984, 986 (1993), and defendant maintains that the trial court did not adequately consider the *Gardner* factors here. We disagree.

¶ 49. The trial court individually addressed each *Gardner* factor in its four-page decision on defendant's objection to the State's notice of intent to impeach by prior conviction. Admission of the prior conviction for impeachment purposes was well within the court's discretion as justified by its weighing of the *Gardner* factors. Since the prior conviction was a completely distinct offense, and fairly remote, from the pending BWI/Fatal charge, there appeared little or no risk that the jury would unfairly infer that defendant was either a person prone to BWI or an inherently bad character. Defendant contends that his seven-year-old felony conviction for knowingly transporting stolen property has no greater bearing on his credibility than the four-year-old burglary conviction in *Ashley*, which was deemed of "limited probative value." *Ashley*, 160 Vt. at 130, 623 A.2d at 987. *Ashley* is inapposite. The essential holding in *Ashley*—that the trial court must examine and weigh all of the *Gardner* factors in the exercise of its discretionary ruling on evidence—was not based on the characterization or age of the burglary conviction, but rather on the trial court's failure to "engage in the complete analysis of the factors that our cases require." *Id.*

¶ 50. Here, the trial court conducted the required analysis. Why a burglary conviction was perceived as having limited probative value was unexplained in *Ashley*, but burglary's elements of trespass with intent to commit various other crimes, including violence or damage to property, are not limited to acts of dishonesty. See 13 V.S.A. § 1201(a). In contrast, and as noted by the trial court, defendant's conviction for knowingly transporting stolen property specifically requires conscious dishonesty. See 18 U.S.C. § 2314 (prohibiting interstate transport of goods by person "knowing the same to have been stolen, converted or taken by fraud" and prohibiting several other acts if done with fraudulent

intent). Dishonesty is relevant to credibility, *Gardner*, 139 Vt. at 460, 433 A.2d at 251, and defendant offers no reason to assume that a person adjudicated as dishonest is necessarily more reliable as a witness seven years hence so as to compel a conclusion that the court's ruling to leave the weight of the credibility issue to the jury's determination was an abuse of discretion.

¶ 51. Defendant's focus on the twelve-year age of the offense, rather than the seven-year age of the conviction, is misplaced. Impeachment on the basis of felony criminal conduct is premised upon actual conviction. V.R.E. 609(a)(2). Although cases may refer to the age of the "crimes" at issue, see *Gardner*, 139 Vt. at 461, 433 A.2d at 252 (suggesting that "[o]lder crimes" are less relevant to the issue of credibility), in context it is clear that the cases are referring to criminal "convictions." *Id.* (referring to the "length of time that has passed since the *conviction*") (emphasis added); *Ashley*, 160 Vt. at 129, 623 A.2d at 986-87 (specifying that this *Gardner* "factor is the age of the *convictions*") (emphasis added). This distinction between conviction and date of the offense for impeachment is well-founded—the date of conviction is certain, while the circumstances of any delay between commission of the criminal act and conviction are not. Measuring time from date of offense invites collateral litigation over investigation, discovery and concealment of the offense, all distracting from the ultimate issue on trial. The trial court did not abuse its discretion by focusing on the date of conviction as contemplated by Rule 609.

## VIII. *Multiple Charges*

¶ 52. Finally, defendant argues that the trial court erred in allowing him to be charged, convicted, and sentenced for two separate offenses of boating while intoxicated in violation of 23 V.S.A. § 3323 arising out of the same incident—one for each child's death. Defendant argues that while the penalty provision in § 3317(f) provides for a penalty of not more than five years "[i]f the death of any person results from the violation of [§ 3323]," § 3323(e) explains that "[a] person may not be convicted of more than one offense under this section arising out of the same incident."

¶ 53. Defendant argued below, as he does here, that the plain meaning of § 3323(e) dictates that a person may be convicted of

only one offense of boating while intoxicated with death resulting. He also argues that the rule of lenity requires that any doubts in interpreting a penal statute be resolved in favor of the accused. The State argues that the language of § 3323(e) reflects the Legislature's intent to prohibit convictions for multiple offenses based on the three different ways a person may be found guilty of boating while intoxicated under § 3323(a). Section 3323(a) provides:

> (a) A person shall not operate, attempt to operate or be in actual physical control of a vessel on the waters of this state while:

> (1) there is 0.08 percent or more by weight of alcohol in his or her blood, as shown by analysis of his or her breath or blood; or

> (2) under the influence of intoxicating liquor; or

> (3) under the influence of any other drug or under the combined influence of alcohol and any other drug to a degree which renders the person incapable of operating safely.

¶ 54. The trial court concluded both interpretations were reasonable under the plain language of the statute, but ultimately agreed with the State's construction. The court reached its conclusion by comparing Vermont's DUI statute with the subsequently enacted BWI statute, which tracks the language of the DUI statute. See 23 V.S.A. § 1201(a), (e); 23 V.S.A. § 3323(a), (e). The court examined the history of amendments to the DUI statute and concluded that the Legislature's addition of § 1201(e) at the same time it amended § 1201(a) to include subsections (a)(1)-(3), see 1973, No. 79, § 1, reflected a legislative concern with preventing multiple convictions based on the different ways the State could prove the operator was impaired.[12] On this basis, the court concluded that § 3323(e) does not bar conviction of two counts of BWI/Fatal.

---

[12] Prior to the 1973 amendment, § 1201(a) stated: "A person may not operate, attempt to operate, or be in actual physical control of any vehicle while under the influence of intoxicating liquor," 1969, No. 267 (Adj. Sess.), § 1, and the statutory scheme at that time also included a specific penalty provision, § 1210, if any death resulted from a violation of § 1201, 1969, No. 267 (Adj. Sess.), § 10.

¶ 55. We need not resolve whether the court's interpretation of the Legislature's intent in enacting § 3323(e) is correct because multiple convictions are prohibited for a violation of § 3323(a), even without reliance on § 3323(e), in accordance with our holding in *State v. LaBounty*, 2005 VT 124, ¶ 10, 179 Vt. 199, 892 A.2d 203 (holding that it was plain error for trial court to allow more than one conviction of grossly negligent operation of a vehicle where more than one person was injured). As we explained in interpreting a similar statutory scheme in *LaBounty*,[13] where the statute did not explicitly address whether the operator was guilty of multiple offenses if multiple injuries occurred, "[t]he question thus becomes whether the actus reus prohibited by the statute is the act of driving negligently, which defendant committed only once, or the act of causing serious injury, which defendant committed twice." 2005 VT 124, ¶ 6. In *LaBounty*, we concluded that 23 V.S.A. § 1091(b) "defines the act of grossly negligent operation in terms of driving, not in terms of the consequences that might result from driving negligently[,] . . . while injuries resulting from the driver's gross negligence serve only to enhance a convicted violator's punishment." *Id.* We rejected the State's argument that the statute's reference to bodily injury to "any person" makes it analogous to statutes allowing multiple convictions for harm to multiple victims, and distinguished cases upholding multiple convictions where the statute in question defined a crime with reference to the victim. See *id.* ¶¶ 7-9 (citing *State v. Senna*, 154 Vt. 343, 346-47, 575 A.2d 200, 202 (1990) (kidnapping); *State v. Dunlop*, 721 P.2d 604, 609 (Alaska 1986) (vehicular manslaughter); *State v. Rabe*, 291 N.W.2d 809, 822 (Wis. 1980) (homicide by intoxicated use of a motor vehicle)).

¶ 56. Just as the statute prohibiting grossly negligent operation defines the prohibited act "solely by reference to the standard of care required of drivers," with enhanced sentence provisions depending on the consequences, *LaBounty*, 2005 VT 124, ¶ 7, the act prohibited by the BWI statute is defined solely by the operation of a vessel while intoxicated, with enhanced sentencing provisions depending on the consequences. Because death result-

---

[13] The statute at issue in *LaBounty* was 23 V.S.A. § 1091(b), which provides that "[a] person who operates a motor vehicle on a public highway in a grossly negligent manner shall be guilty of grossly negligent operation," *id.* § 1091(b)(1), and also provides a specific enhanced penalty if serious bodily injury or death of any person results from the violation, *id.* § 1091(b)(3).

ing is not included in the actus reus — the criminalized conduct of the offense — defendant's second conviction cannot stand.[14]

¶ 57. The trial court sentenced defendant to four to five years on each count, suspending all but three years to serve on each count, with the sentences to run consecutively. As in *LaBounty*, we recognize here that the trial court sentenced defendant on the first count based on harm to only one victim. See *id.* ¶ 10; see also *State v. Simpson*, 160 Vt. 220, 226-27, 627 A.2d 346, 350 (1993) (holding that remand for resentencing is appropriate when sentence for reversed conviction appears to have influenced trial court's sentence for the affirmed conviction). We therefore reverse defendant's second conviction and remand for resentencing on the conviction for the one violation, which resulted in the death of two children.

*Conviction on one count of boating while intoxicated, death resulting, is affirmed, the second conviction is reversed, and the case is remanded for resentencing.*

---

[14] While it has no impact on our holding here, it is noteworthy that the penalty subsection for boating while intoxicated with death resulting specifically states that it "shall not be construed to limit or restrict prosecutions for manslaughter," 23 V.S.A. § 3317(f), a crime defined with reference to the victim, see *State v. Poirier*, 142 Vt. 595, 598, 458 A.2d 1109, 1111 (1983) ("We have defined involuntary manslaughter as a killing caused by an unlawful act, but not accompanied with any intention to take life.") (quotations omitted).